633 F.2d 1054
 105 L.R.R.M. (BNA) 3034, 89 Lab.Cas. P 12,350
 UNITED DAIRY FARMERS COOPERATIVE ASSOCIATION, Petitioner in
No. 79-1807,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Teamsters Local
Union No. 205, Intervenor.
TEAMSTERS LOCAL UNION NO. 205, Petitioner in No. 79-1883,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
United Dairy Farmers Cooperative Association, Intervenor.
 Nos. 79-1807, 79-1883.
 United States Court of Appeals,
Third Circuit.
 Argued May 23, 1980.
Decided Oct. 30, 1980.
 
 John Regis Valaw, James J. Flaherty (argued), Pittsburgh, Pa., Stephen J. Cabot, Pechner, Dorfman, Wolffe, Rounick & Cabot, Philadelphia, Pa., for United Dairy Farmers Cooperative Association.
 Hugh J. Beins, Jonathan G. Axelrod (argued), Bethesda, Md., Louis B. Kushner, Rothman, Gordon, Foreman, Groudine, P. A., Pittsburgh, Pa., for Teamsters Local Union No. 205.
 Richard B. Bader (argued), Atty., William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Asst. Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., for N. L. R. B.
 William J. Curtin, E. Carl Uehlein, Jr., Sozeen J. Mondlin, Morgan, Lewis & Bockius, Washington, D. C., Stephen A. Bokat, Washington, D. C., for Chamber of Commerce of the U. S., amicus curiae.
 Before ADAMS, VAN DUSEN and HIGGINBOTHAM, Circuit Judges.
 OPINION OF THE COURT
 A. LEON HIGGINBOTHAM, Jr., Circuit Judge.
 
 
 1
 In this case the National Labor Relations Board (the Board) found that the employer had committed numerous unfair labor practices before and after the certification election. In formulating remedies to rectify these patent violations by the employer, the Board declined to issue a bargaining order because the member of the Board who supplied the critical third vote for the majority concluded that the Board lacked the power to do so in the absence of an election victory or card majority by the union. Thus, in reviewing its decision, we are presented with an issue commented on in dictum by the Supreme Court in NLRB v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547, reh. den., 396 U.S. 869, 90 S.Ct. 35, 24 L.Ed.2d 123 (1969), but not specifically reached: whether and under what circumstances the Board has the remedial authority to order an employer who has committed unfair labor practices to bargain with a union that has never won a certification election or secured a card majority. We affirm the Board's findings of various unfair labor practices by the employer, including the illegal dismissal of seven employees, the illegal threat of coercion, and the illegal distribution of a bonus during the election period. We also hold, however, that in remedying these and other unfair labor practices, the Board has the authority, despite the absence of a card majority and election victory, to issue a bargaining order in the circumstances of this case. We will therefore remand the case to the Board for it to determine whether it wishes in the exercise of its discretion to issue a bargaining order.
 
 I.
 FACTS
 
 2
 The facts of this case reveal a blatant and relentless effort by the employer, United Dairy Farmers Cooperative (United Dairy), to use unlawful means to block unionization attempts among its employees. We will review these efforts in some detail not because there is any reasonable doubt as to the illegality of United Dairy's actions, but because of the need to understand the nature of these violations when we consider the remedial authority of the Board in the circumstances of this case.
 
 
 3
 United Dairy is a cooperative established in 1965 by farmers in western Pennsylvania for the processing and retail sale of their milk. It operates a milk processing plant in Pittsburgh, and owns 49 retail stores to sell its products to the public. At the time this case arose it used three types of employees in its operations. One group of employees worked in the processing plant itself; a second group of about 30 drivers and their helpers-the group directly involved in the events of this case-transported the processed milk and dairy products in leased trucks to the retail stores; and a third group of employees operated the retail stores.
 
 
 4
 A review of the actions of United Dairy in this case must begin with a prior case involving United Dairy that came before the Board. In the winter of 1970-1971, the Amalgamated Meat Cutters and Butcher Workmen of North America (AFL-CIO) attempted to organize the sales clerks in the retail stores. As reported in the earlier case before the Board, the president of the United Dairy, Ernest Hayes, announced at a Christmas banquet of salesclerks that "(h) e would fire any girl who had signed a Union card.... he would franchise the stores if a Union got in, and (the clerks) would all be out of a job. He (also) said that he was going to subpoena the Union organizers, get their Union cards, and these girls would be fired." United Dairy Farmers Coop. Ass'n, 194 NLRB 1094, 1095, enforced, 465 F.2d 1401 (3d Cir. 1972). After Hayes followed through on his threat by firing the leading supporter of the union, the union brought a complaint to the Board. The Board held that United Dairy had illegally threatened to discharge union supporters and to franchise its stores, interrogated employees about their union activity, and discharged an employee because of her union activity, in violation of Sections 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) & (3) (the Act). United Dairy was ordered to reinstate the employee and cease and desist from any further illegal statements. Nevertheless, the union drive among the clerks proved unsuccessful.[1]
 
 
 5
 The events precipitating the present controversy arose in the fall of 1973 when a self-organizing drive was begun among the group of approximately 30 truck drivers and helpers employed by United Dairy to deliver the processed milk products to the retail stores.[2] On Friday, November 23rd, three days before the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America Milk and Ice Cream Salesmen, Drivers and Dairy Employees Local Union No. 205 (the Union) petitioned for an election, a truck driven by one of the strong Union supporters in this group, Bruce Bach, and his helper, Bernard Dhans, was in an accident. Two wheels fell off the rear axles. The truck had to be towed to the shop for what subsequently proved to be expensive repairs.
 
 
 6
 On Sunday, members of the board of directors of United Dairy held a meeting at which they decided that Bach should be fired. This was the first time that the directors had ever independently made the decision to fire an employee, the type of decision which had previously been made by Hayes alone. They did so in this case without ever speaking with Bach about the cause of the accident or waiting for an official report on the repairs. Bach was notified of his termination by telephone on Sunday. He subsequently filed a complaint with the Board charging that his dismissal was motivated by his support for the Union.
 
 
 7
 On Monday, the Union filed a petition for a certification election which was later set for January 8, 1974. The next day Hayes questioned employee Larry Thomas on whether he had signed a union card. Thomas lied and said no. Hayes then informed him that he knew the Union was organizing and warned, according to Thomas' later testimony, that "if it gets in, you know what will happen to the guys who does ... if the union does get in, he said that he would have to close down, or subcontract, or something like that."
 
 
 8
 At Christmas, United Dairy distributed, for the first time in its history, a cash bonus to all of its employees, with the largest bonuses going to the drivers and the plant employees. Drivers and plant employees who had worked for the company for over one year received one hundred dollars; those who had been employed from 30 days to one year received fifty dollars, while those who had been there for under 30 days received twenty-five dollars. The retail employees received smaller bonuses-fifty dollars for those who had worked over a year, and twenty-five dollars for those who had worked under a year.
 
 
 9
 After Christmas but still before the January 8, 1974 certification election, Hayes called driver Jerry Finley into his office and, according to Finley's testimony, informed him that "if the union goes in, the farmers (who operate United Dairy) would come down and smash some heads; the farmers would never let the union in; they would close the plant down first, and start another plant under a new name." He also warned that the Teamsters had caused other companies to go bankrupt. Finally, on the day before the election, Hayes called Thomas again and, according to Thomas's testimony, warned him that "if the union gets in, we will have to close up." He added that the company was counting on him.
 
 
 10
 The results of the election proved inconclusive. The vote was 10 to 9 in favor of the Union, but seven additional votes were challenged and, on January 23, the Union filed a representation complaint challenging the employer's conduct during the campaign.
 
 
 11
 While these claims were being investigated by the Board and the result was still in doubt, company officials interrogated several other employees regarding their union activities. Immediately after the election, Helen Zitney, a supervisor and secretary of United Dairy, brought employee Melvin Lerch into the office. Claiming to know that one of the last two ballots cast was for the Union, she asked Lerch which way he had voted. He answered that he had voted no, but that he had signed a Union card. She asked him whether he knew Larry Thomas was a Teamster. He responded that he didn't know. She then asked whether he had discussed the Union with anyone else. When he admitted he had discussed it with Bruce Bach, she replied that she was "disappointed" in him.
 
 
 12
 The other incidents following the election involved Craig Moore, a night foreman and supervisor. Several days after the election, he asked Larry Dhans whether his relative had made several statements in support of the Union. According to Dhans, Moore claimed that "(y)our damn brother and you (are) trying to get the Union in (United Dairy)," and warned that the "damn union will not get in because (United Dairy) had the election won before they even voted." Moore also questioned Theodore Fritsch, about a week after the election, about whether he had voted for the Union. If the Union got in, he threatened, "they would sell the plant, buy the Sealtest plant, and fire all the drivers who voted for the Union," adding that "they knew who voted for the Union." Finally, a few weeks after the election, Moore asked Finley why he had voted for the Union. When Finley challenged Moore's knowledge of his vote, he replied that "he knew the ten guys who voted for the Union." Rather than let the Union in, United Dairy would "close down the plant and open another plant under a different name."Finally, on March 14th and 25th, while the outcome of the election was still in doubt, president Hayes announced at meetings of all the drivers that the company would henceforth transport milk to the retail stores by independent contractors. All current employees could bid for their "contracts," but those who refused to serve as independent contractors would be dismissed. Identical papers for seven corporations were drawn up by the company attorney, and one or more employees participated in each corporation. The six who refused the change in status were, as Hayes had warned, fired on March 31. Those who consented to the change, as it turned out, performed the same work as before; used the same trucks; leased these trucks from the company owned by United Dairy farmers from which United Dairy previously leased trucks; assumed no responsibility for the maintenance, gas or insurance for the trucks; and invested none of their own capital. The only significant change in operation was that drivers were now paid by the number of cases of dairy products they delivered, rather than the hours they worked. They also no longer received any fringe benefits, such as unemployment insurance, health insurance, or disability benefits.
 
 
 13
 With the new dismissals and the change in status, the Union amended its complaint to allege that United Dairy had also illegally dismissed the six employees and changed the status of the remaining drivers in an attempt to avoid unionization, in violation of Sections 8(a)(3) and (1). The Union's challenges to the firing of the employees, the election, and the employer's post-election conduct were then consolidated with the Bach complaint and heard by the Administrative Law Judge (ALJ).
 
 
 14
 In an opinion dated August 22, 1974, the ALJ found that the dismissals of Bach and of the six employees who refused to serve as "independent contractors," and the change in status of the drivers who continued with United Dairy, were motivated by the employer's anti-union animus and violated Sections 8(a)(3) and (1). United Dairy was also found, both before and after the election, to have coercively interrogated employees, illegally indicated knowledge of their votes, and threatened the closing down of the plant. As remedies for these violations, the ALJ recommended that United Dairy be ordered to (1) cease and desist from any further illegal dismissals or coercive statements; (2) reinstate Bach and the other six employees to their former or to substantially equivalent positions; (3) dissolve the paper corporations and contractual arrangements and to reestablish the prior employee system; (4) make whole all of the employees who remained with United Dairy or were discharged for any reduction in salary or fringe benefits that resulted from the illegal change in method of reimbursement; and (5) bargain in good faith with the Union. The ALJ also recommended that all of the seven contested ballots be counted.
 
 
 15
 The decision of the ALJ was appealed to the Board. On April 17, 1975, a three-member panel affirmed all of the ALJ's findings of unfair labor practices and adopted its recommendation on the disposition of the challenged ballots. United Dairy Farmers Coop. Ass'n, reprinted in App., at 126a. However, it deferred consideration of the challenges to the election and the appropriate remedy pending the counting of the disputed ballots, since it was possible that the Union had won the election. When these ballots were opened, and the valid votes counted, the Union was discovered to have lost the election, 14 to 12. Formulation of the appropriate remedy in light of the Union's loss was subsequently deferred for consideration by the full Board.
 
 
 16
 In its decision, which was delayed for over four years,[3] the Board declined to issue a bargaining order but instead imposed numerous remedial obligations on the employer, in addition to those recommended by the ALJ, so as to eliminate as much as practicable the effects of past unfair labor practices on any future election. The decision included a plurality opinion, joined by two members, and two other opinions, each concurring in part and dissenting in part.
 
 
 17
 A careful review of these three opinions reveals that the refusal by the Board to issue a bargaining order was technically based on the view expressed in the opinion of one member that the Board lacked such authority when the union did not win the certification election and also did not obtain a card majority. The two members whose plurality opinion became the basis of the Board's order recognized that the Board "may" have the authority under the Act to issue a bargaining order without a card majority, but judged that the facts of this case did not warrant the Board's adoption of such a coercive remedy. Accordingly, they ordered, in addition to the remedies recommended by the ALJ, the imposition of extraordinary election remedies for two years or until a Board certification. These remedies included a right by the Union to reasonable access to employer blackboards and to employees on the premises; a right by the Union to equal time to respond to any address by the employer regarding Union representation; the right to give a 30 minute address prior to any Board election; posting, mailing and public reading to the employees by the employer of the Board's notice; reprinting of the notice in local newspapers and company publications; and, for one year, receipt by the Union of the names and addresses of all the current employees. United Dairy Farmers Coop. Ass'n, 242 NLRB No. 179, 101 LRRM 1278, 1279-83 (1979).[4] In all other respects they affirmed the ALJ's remedial orders.
 
 
 18
 Two other members of the Board concluded in a separate opinion that a bargaining order should be issued, but, since this position did not enjoy the support of a majority of the members of the Board, they indicated in the alternative that they would accept the remedies proposed by the plurality opinion. Id. at 1283-89. In a third opinion the fifth member of the Board, John Penello, concluded, like the first two, that no bargaining order should issue. His position, however, was specifically based on the judgment that the Board lacked the legal authority under the Act to issue a bargaining order when the union, as in this case, had lost the election and had never secured a card majority. He expressed no view on whether he would support the issuance of a bargaining order if the Board had such authority. Id. at 1289-94.[5] Thus, while a three member majority agreed that a bargaining order should not be issued, the critical third vote was supplied by a member whose decision was based upon his conclusion that the Board lacked such authority.
 
 
 19
 Both the Union and United Dairy subsequently petitioned this court to review the order of the Board, and the Board cross-applied for enforcement of its order. United Dairy challenges some of the findings of the Board that it violated Sections 8(a)(1) and (3), and attacks the severity of the remedial order imposed by the Board. The Union, on the other hand, while supporting the finding by the Board of unfair labor practices, challenges the refusal of the Board, by virtue of member Penello's opinion, to issue a bargaining order on the ground that the Union lacked a card majority. It asks that this court impose a bargaining order, or, alternatively, remand to the Board for it to reconsider its decision with the understanding that it has that authority. The United States Chamber of Commerce has also entered an amicus curiae appearance arguing that the Board retains no such authority. Finally, the Board asks that we enforce its order. We first will consider the challenges to the Board's finding of unfair labor practices (Section II), and then turn to the Board's legal conclusion that it lacked the authority to issue a bargaining order (Section III).
 
 II.
 UNFAIR LABOR PRACTICES
 A. Dismissal of Bruce Bach
 
 20
 United Dairy's first challenge is to the Board's finding that it illegally dismissed Bruce Bach in retaliation for his union activity, in violation of Section 8(a)(3). That section provides that "(i)t shall be an unfair labor practice for an employer ... by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." The critical question in discharge cases is "the intent of the employer to discourage union activity." NLRB v. Armcor Industries, Inc., 535 F.2d 239, 243 (3d Cir. 1976). "When the record establishes a prima facie case that 'the employer engaged in discriminatory conduct which could have adversely affected employee rights to some extent, the burden is upon the employer to establish that he was motivated by legitimate objectives since proof of motivation is most accessible to him'." Id., quoting NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 34, 87 S.Ct. 1792, 1797-1798, 18 L.Ed.2d 1027 (1967) (emphasis in original).
 
 
 21
 The courts have delegated to the Board in the first instance the task of interpreting the motivational foundations for actions of the employer in labor settings. We may not disturb its decision so long as we discover substantial evidence in the record as a whole to support its factual findings, and the factual findings, in turn, support the Board's determination of an unfair labor practice. Universal Camera Corp. v. NLRB, 340 U.S. 474, 491, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951).
 
 
 22
 United Dairy's challenge to the Board's findings rests on the assertion that its officials did not know Bach was a key Union supporter, or, assuming arguendo that they did know, that he was fired solely because he failed to inspect or drive his truck properly. There clearly was substantial evidence, however, to support the Board's finding that Bach was fired for his Union activities. Bach testified that he spoke frequently with foreman Moore about the Union. Both he and his brother were also told seven months before his discharge by foreman Hayes, the son of president Hayes, that they were suspected of supporting the unionization efforts. The ALJ relied on this testimony and the fact that the unit was comprised of only 30 employees to reach his conclusion that company officials were aware of Bach's sympathies. United Dairy offers no convincing argument to undermine that judgment.
 
 
 23
 Our conclusion that there is substantial evidence to support the Board's decision that Bach's activities caused his dismissal rests on evidence of an anti-union animus in the dismissal, and the patent implausibility of the alternative rationales proffered by the employer. Officials at United Dairy, it must be remembered, had illegally dismissed a union organizer in a different unit in a prior case, and threatened in several instances to fire or penalize union supporters in the present case. Moreover, the firing occurred hastily over the weekend before the election petition was filed. This is important not only because "(t)he abruptness of a discharge and its timing are persuasive evidence as to (the Company's) motivation," NLRB v. Montgomery Ward & Co., 242 F.2d 497, 502 (2d Cir. 1957), cert. den. sub nom. 355 U.S. 829, 78 S.Ct. 40, 2 L.Ed.2d 41 (1957), but because no report on the cause of and damage from the accident was available. The directors did not interview or talk to Bach about the surrounding circumstances, or even know whether Bach, rather than his helper, Dhans, whose duties also included driving the truck, was driving when the accident occurred. The fact that the decision to fire Bach was officially made by the board of directors, although, according to one director, that body had never before made the decision to fire an employee, adds to the likelihood that an ulterior motive lay behind United Dairy's actions. Indeed, Hayes testified that he actually talked to several of the directors on Saturday about the incident and one of them had asked Hayes, "Why didn't I fire him?" Hayes replied, "Well, that's what will have to be done." The interpretation reached by the ALJ is manifest:
 
 
 24
 The patent attempt to remove Hayes from the active arena in order to avoid the inescapable thought that he repeated the same offense of which he had been found guilty, contributes largely toward casting a shadow of doubt upon the entire defense.
 
 
 25
 ALJ opinion, reprinted in App., at 21a.
 
 
 26
 In support of its position, United Dairy offers the testimony of a director, Richard Thomas, who inspected the truck after the accident on Friday and purportedly found evidence, by smelling the clutch, that the truck had been poorly driven when the accident occurred. He also claimed that the looseness of the lugs holding the wheel on the axle should have been obvious before the accident, and therefore revealed a lack of diligent inspection by Bach. The ALJ, however, quite reasonably rejected the testimony; there was evidence that Bach had repeatedly complained about the poor condition of his truck, and asked that it be tested and repaired. A mechanic offered by United Dairy had test driven the truck the day before the accident and found no defects precluding its continued use.
 
 
 27
 United Dairy also relies on Bach's prior work history as a factor in his dismissal. Bach had purportedly drunk alcohol on the job, broken bottles, struck a fellow employee, and driven recklessly. In all of these cases, however, there is overwhelming evidence to support the Board's finding that United Dairy's allegations are either internally inconsistent, wrong, or fail to distinguish Bach's actions from those of other employees who were not discharged.[6]
 
 B. Distribution of Christmas Bonus
 
 28
 The Board also found that United Dairy had violated Section 8(a)(1) during and after the election period by coercively interrogating employees about their votes, threatening to close the plant down if the Union succeeded, conveying the impression of surveillance, and illegally distributing a Christmas bonus. United Dairy only challenges on appeal the Board's findings as to the bonus. It argues that there is not substantial evidence to support the Board's conclusion that its distribution of a bonus immediately before Christmas was motivated by an intent to induce support for the employer among the employees, in contravention of the Supreme Court's decision in NLRB v. Exchange Parts Co., 375 U.S. 405, 409, 84 S.Ct. 457, 459-460, 11 L.Ed.2d 435 (1964). See also NLRB v. Garry Manufacturing Co., 630 F.2d 934 at 941-943 (3d Cir. 1980); Frito-Lay, Inc. v. NLRB, 585 F.2d 62, 66 (3d Cir. 1978). The bonus purportedly resulted from increased profits when United Dairy's business doubled between 1973 and 1974. However, we conclude that this decision by the Board also finds substantial support in the record.
 
 
 29
 Distribution of the Christmas bonus was without precedent in the entire 8-year history of United Dairy, rendering the employer's motive suspect. United Dairy has also not directed us to any evidence that the decision to distribute the bonus was made before the election petition. See J. P. Stevens Co. v. NLRB, 461 F.2d 490, 493 (4th Cir. 1971) ("absent a showing by the employer of a proper business purpose or necessity, the timing of the announcement of the grant of an additional holiday so close to the election is itself evidence of unlawful motive"). The bonuses United Dairy gave to employees who were to vote in the election were also two times greater than those paid to its retail employees, suggesting that, even if its decision to grant a bonus were benign, the amounts of those bonuses were not. Moreover, United Dairy's reliance on its large profits rings hollow in light of its claim before the Board that it converted its employees to independent contractors because of fears it would go out of business. In light of these factors and the employer's general attitude toward unionization efforts during this period, we will affirm the Board's finding of an 8(a)(1) violation.[7]
 
 
 30
 C. Conversion of Employees to "Independent Contractors"
 
 
 31
 Finally, the Board found that the conversion in March 1975 of the positions of the drivers to independent contractor status, and the firing of six employees who refused to change, was motivated by an intent to prevent unionization, and therefore constituted a violation of Sections 8(a)(3) and (1). The conversion of employees to independent contractor status is an unfair labor practice when motivated by anti-union animus. See, e. g., Tonkin Corp. of California v. NLRB, 420 F.2d 495, 498 (9th Cir. 1969). As we held in NLRB v. Eagle Material Handling, Inc., 558 F.2d 160, 169 (3d Cir. 1977) (citations omitted), when employees are laid off:
 
 
 32
 An employer violates sections 8(a)(3) and (1) of the Act by discontinuing a part of its business and laying off persons employed therein if the action is motivated at least in part by antiunion considerations ... Conversely, an employer does not violate sections 8(a)(3) and (1) by discontinuing a part of its business and laying off employees if the action is motivated solely by economic considerations.
 
 
 33
 Accord, NLRB v. Armcor Industries, Inc., 535 F.2d at 243. We find that there clearly is substantial evidence to support the Board's finding in the present case that the conversion was implemented with the purpose of avoiding unionization.
 
 
 34
 Perhaps the strongest evidence of United Dairy's motivation in converting the status of its drivers were the numerous threats made by Hayes. In the case previously before this court and in the present case, Hayes and other officials warned on numerous occasions that United Dairy would close the plant if a union campaign succeeded. The board of directors considered the conversion on February 9th, soon after the election, and the plan was announced in March, while the results were still in doubt.
 
 
 35
 United Dairy's motives become even more questionable when its contradictory justifications made before the Board, now described before us as "economic considerations," Brief of United Dairy at 14 n.2, are considered. It contended below that the conversion was motivated by economic necessity, although it concedes that it enjoyed a large expansion in business immediately before the conversion. Its alternative (and contradictory) claim before the Board-that the conversion was undertaken in order to increase the number of drivers so as to support its expanded operation-also appears to be fatuous. It had announced about nine months before the conversion that it wished to convert, but had had only one bid at that time. The interest in the change among the board of directors was rekindled only after the union election, and ultimately resulted in a reduction in the work force by six drivers-those six who refused to become independent contractors and were fired. United Dairy cited no evidence that any other truckers were hired.[8]
 
 
 36
 To recapitulate, we hold that there clearly is substantial evidence in the record to support the findings of the Board that United Dairy violated Section 8(a)(3) by discharging Bruce Bach; violated Section 8(a)(1) by offering a bonus immediately before the certification vote; and violated Section 8(a)(3) by converting the status of the remaining employees to independent contractors and firing those employees who refused to accept the change in status.[9] We now must turn to the propriety of the remedies ordered by the Board.
 
 III.
 REMEDIES
 
 37
 The Board ordered United Dairy to (1) cease and desist from committing any of the illegal practices again; (2) make whole all of its former and present drivers for any loss in salary or fringe benefits resulting from illegal dismissals or concessions; (3) abolish the independent contractor system and reinstate the employee driving system that had previously existed; and (4) offer employment as drivers to all former employees illegally dismissed or converted. To undo the effects of the prior unfair labor practices on the election process, the Board also imposed various requirements of union access and employer admission of error, rather than imposing a bargaining order.
 
 
 38
 We hold that under the egregious facts of this case involving a recidivist employer, all of these remedial orders come within the broad discretionary authority of the Board. Abolition of the independent contractor system that was found to be a sham by the ALJ, and the rehiring of drivers as employees with back pay, will help make whole these employees while not imposing an unfair burden on the employer. See, e. g., NLRB v. White Motor Co., 404 F.2d 1100, 1104 (6th Cir. 1968). The various additional remedies specifically ordered sua sponte by the Board so as to undo the effects of the employers' action on the election process were not challenged before the Board by United Dairy, and therefore, under Section 10(e), 29 U.S.C. § 160(e), may not be challenged before this court. See Hedstrom Co. v. NLRB, 629 F.2d 305 at 312 (3d Cir. 1980) (in banc); Amax Coal Company v. NLRB, 614 F.2d 872, 887 n.13 (3d Cir. 1980).
 
 
 39
 Nevertheless, our review cannot end here. The failure of the Board to issue a bargaining order was predicated on the view expressed in the opinion of member Penello that it lacked the authority to do so in the absence of a card majority or election victory. Since the choice of remedies ordered by the Board is predicated on this legal conclusion, we must consider it in further detail.
 
 A. NLRB v. Gissel
 
 40
 Our analysis of the authority of the Board to issue a bargaining order must begin with the Supreme Court's decision in NLRB v. Gissel, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). Since Gissel is factually distinguishable from this case we must determine whether these factual differences are sufficiently significant to make the precepts announced in Gissel inapplicable to the instant case. An additional problem we must consider is whether in Gissel the Supreme Court was impliedly approving the rationale that the Board could issue a bargaining order in cases where the union neither won the election nor had a card majority.
 
 
 41
 First, as to the factual differences, in each of the four cases consolidated in Gissel, union authorization cards had been obtained from a majority of the employees;[10] in contrast here there is no finding that the Union ever had authorization cards from a majority of the employees. Does the fact that the Union in this case does not have a majority of Union authorization cards make Gissel inapplicable? Of course one might argue that a case approving bargaining orders where the union had a majority of the authorization cards is not a viable precedent for a bargaining order when the union has never had a majority. However, in justifying the issuance of bargaining orders in those cases where less than egregious unfair labor practices had been committed, the Court in Gissel noted with seeming approval a decision of the Fourth Circuit approving the issuance of a bargaining order when egregious unfair practices had been committed, even though there might be no objective evidence from an election or card majority of the union's majority support. The Gissel court stated in full:
 
 
 42
 Before considering whether the bargaining orders were appropriately entered in these cases, we should summarize the factors that go into such a determination. Despite our reversal of the Fourth Circuit below in Nos. 573 and 691 on all major issues, the actual area of disagreement between our position here and that of the Fourth Circuit is not large as a practical matter. While refusing to validate the general use of a bargaining order in reliance on cards, the Fourth Circuit nevertheless left open the possibility of imposing a bargaining order, without need of inquiry into majority status on the basis of cards or otherwise, in "exceptional" cases marked by "outrageous" and "pervasive" unfair labor practices. Such an order would be an appropriate remedy for those practices, the court noted, if they are of "such a nature that their coercive effects cannot be eliminated by the application of traditional remedies, with the result that a fair and reliable election cannot be had." NLRB v. S.S. Logan Packing Co., 386 F.2d 562, 570 (C.A. 4th Cir. 1967); see also NLRB v. Heck's, Inc., 398 F.2d 337, 338. The Board itself, we should add, has long had a similar policy of issuing a bargaining order, in the absence of a § 8(a)(5) violation or even a bargaining demand, when that was the only available, effective remedy for substantial unfair labor practices. See, e. g., United Steelworkers of America v. NLRB, 126 U.S.App.D.C. 215, 376 F.2d 770 (1967); J.C. Penney Co., Inc. v. NLRB, 384 F.2d 479, 485-486 (C.A. 10th Cir. 1967).
 
 
 43
 395 U.S. at 613-14, 89 S.Ct. at 1939-1940. By the above discussion, was the Supreme Court advising lower courts of their views as to the Board's power to issue bargaining orders in exceptional cases "without need of inquiring into majority status," or was the Court's decision an intellectual excursion not intended as a sign post giving directions which lower courts should follow in the future? Although several commentators have observed that the Court did not specifically endorse the issuance of bargaining orders in the absence of a card majority,[11] virtually every court that has discussed the issue has stated that a bargaining order may be issued in the absence of a card majority. In NLRB v. Armcor Industries Inc., 535 F.2d 239, 244 (3d Cir. 1976), Judge Rosenn, writing for this court, said:
 
 
 44
 It is by now a familiar refrain that the Gissel court posited a tripartite categorization of unfair labor practices for considering the issuance of bargaining orders without requiring elections. First, in "exceptional cases" marked by "outrageous" and "pervasive" unfair labor practices which eliminate the possibility of holding a fair election, a bargaining order may issue even without showing that the union at one point had a card majority.
 
 
 45
 We agree with Judge Rosenn's analysis of Gissel that the Board in exceptional cases has the right to issue bargaining orders even where there is no showing that the union at one point had a card majority. Judge Rosenn's analysis has been repeated almost verbatim in a series of cases in this court,[12] and other courts have agreed with his view.[13] We are mindful, however, that in Armcor the union had signed authorization cards from a majority of the employees and in all of the recent cases in our circuit the Board had found that the union had a majority of signed authorization cards. Because in these cases the courts have not been confronted precisely with the factual situation of this case, we will review the reasoning underlying Gissel in more detail.
 
 B. Analysis of the Meaning of Gissel
 
 46
 A basic purpose of the Act is to protect the selection of union bargaining representatives by a majority of the employees in a free and uncoerced manner. Section 7, 29 U.S.C. § 157, guarantees that employees have the right to bargain collectively through representatives of their own choosing, or to refrain from such activity. Section 9(a), 29 U.S.C. § 159(a), specifies further that "representatives designated or selected ... by the majority of the employees in a unit ... shall be the exclusive representatives of all the employees."
 
 
 47
 Since the employer has disproportionate economic power, however, the right of employees to select a majority representative can only be assured by careful restrictions on employer actions and statements. "(W)hat is basically at stake," the Court in Gissel observed, "is the establishment of a non-permanent, limited relationship between the employer, his economically dependent employee and his union agent, not the election of legislators or the enactment of legislation whereby that relationship is ultimately defined and where the independent voter may be freer to listen more objectively and employers as a class freer to talk." 395 U.S. at 617-18, 89 S.Ct. at 1942. Absent legal intervention, many employers have the capability, by threat or exercise of economic power, to coerce the employees' choice of a representative. Thus, Sections 8(a)(1) and (3) generally make it an unfair labor practice for an employer to commit acts or make statements that would illegitimately undermine the employees' free choice. When the employer has illegally intervened, Section 10(c) gives the Board broad remedial authority to undo the effects of the employer violations and assure an uncoerced selection by the employees. See, e. g., Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 216, 85 S.Ct. 398, 406, 13 L.Ed.2d 233 (1964). The contours of this authority are the subject of this case.
 
 
 48
 Normally, the remedial actions undertaken by the Board are intended to assure that future elections of all the employees will properly reflect the uncoerced will of the majority. The Court has noted the "acknowledged superiority of the election process" as a method for selecting a majority representative of employees, Gissel, 395 U.S. at 602, 89 S.Ct. at 1934, and upheld the Board's decision granting employers the right to demand, in the absence of prior unfair labor practice, a certification election to test support for the union. Linden Lumber Div. Summer & Co. v. NLRB, 419 U.S. 301, 95 S.Ct. 429, 42 L.Ed.2d 465 (1974).[14] Thus, when the employer has committed "minor or less extensive unfair labor practices, which, because of their minimal impact on the election machinery," do not unalterably undermine employee free choice in a future election, the Act, as interpreted in Gissel, relies on alternative remedies for restoring the laboratory conditions of the election process. Violation in these cases "will not sustain a bargaining order." 395 U.S. at 615, 89 S.Ct. at 1940. Alternate remedies such as cease and desist orders and reinstatement assure the attainment of uncoerced majority preference, and, in so doing, deter employer violations intended to undermine that choice.
 
 
 49
 The rationale for selecting bargaining representatives by certification election evaporates, however, when the employer has committed such serious unfair labor practices that the laboratory conditions of the past election, as well as any election in the immediate future, are destroyed. In these circumstances, because of the employer's attempt to undermine employee free choice, the goal of a free uninhibited certification election simply cannot be attained regardless of the reparative actions that may be attempted by the Board. Other means to protect employees must be pursued.
 
 
 50
 This need was initially recognized by the Supreme Court in Gissel when it held that Section 9(a)'s requirement that representatives be "designated or selected" by a majority of the employees did not preclude determination of majority will by means other than elections. 395 U.S. at 603, 89 S.Ct. at 1934. The Court explicitly recognized the authority of the Board to issue a bargaining order when it "finds that the possibility of erasing the effects of past practices and ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order ..." Id. at 614-15, 89 S.Ct. at 1940. The Act required the Board to choose the process-card majority or a rerun election-which "better protected" majority will. Card majorities, while conceded to be a less preferred indicia of majority preference than a certification election, see NLRB v. Gissel, 395 U.S. at 603, 89 S.Ct. at 1934; NLRB v. Savair Mfg. Co., 414 U.S. 270, 277, 94 S.Ct. 495, 499, 38 L.Ed.2d 495 (1973), could give a more accurate indication of majority support than a rerun election. Implementation of this subtle choice has resulted in numerous decisions of this court probing whether unfair labor practices identified by the Board are sufficiently serious to merit a bargaining order. See e. g., Hedstrom Co. v. NLRB, 629 F.2d 305 (3d Cir. 1980) (in banc); NLRB v. Garry Mfg. Co., 630 F.2d 934 (3d Cir. 1980); Electrical Products Division of Midland-Ross v. NLRB, 617 F.2d 997 (3d Cir. 1980); Rapid Mfg. Co. v. NLRB, 612 F.2d 144 (3d Cir. 1979); NLRB v. Daybreak Lodge Nursing & Convalescent Home, Inc., 585 F.2d 79 (3d Cir. 1978); NLRB v. Eagle Material Handling Inc., 558 F.2d 160 (3d Cir. 1977); NLRB v. Armcor Industries, 535 F.2d 239 (3d Cir. 1976).
 
 
 51
 In the present case we must examine the remedial authority of the Board when the unfair labor practices of the employer have destroyed, as in Gissel, the chance for a rerun election free of the taint of prior unfair labor practices. Here, however, the Board does not have the option of relying on a card majority to effectuate the will of a majority of the employees. The rationale adopted by the Supreme Court suggests that the mere absence of such indicia of majority support does not in itself preclude the issuance of a bargaining order by the Board. Gissel recognized that a rerun election would not reflect the majority will of employees when the employer had seriously tainted that process. Just as a card majority could provide a better basis for testing employee preferences, so in this case may a bargaining order better further overall employee sentiment when the union has not secured a card majority and the employer has seriously undermined the validity of a union election.
 
 
 52
 The failure to recognize the authority of the Board to issue bargaining orders in these circumstances would undermine the underlying goal of the Act to further the majority preference of all employees. Unions which would have attained a majority in a free and uncoerced election if the employer had not committed unfair labor practices would be deprived of recognition merely because of the employer's illegal conduct.[15]
 
 
 53
 More generally, the absence of such authority might create incentives for employers to engage in illegal prophylactic action with the purpose of preventing the attainment of a card majority. The Supreme Court recognized the authority of the Board to act for comparable reasons in Franks Bros. Co. v. NLRB, 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020 (1944), when it held that the dissipation of a union's majority after an employer unlawfully refused to bargain did not preclude the issuance by the Board of a bargaining order. In commenting on this decision in Gissel, the Court sanctioned the remedial authority of the Board in reducing such perverse incentives.
 
 
 54
 If the Board could enter only a cease-and-desist order and direct an election or a rerun, it would in effect be rewarding the employer and allowing him "to profit from (his) own wrongful refusal to bargain," Franks Bros., 321 U.S. at 704 (64 S.Ct. at 818), while at the same time severely curtailing the employees' right freely to determine whether they desire a representative. The employer could continue to delay or disrupt the election processes and put off indefinitely his obligation to bargain; and any election held under these circumstances would not be likely to demonstrate the employees true, undistorted desires.
 
 
 55
 395 U.S. at 610-11, 89 S.Ct. at 1938. This court has similarly recognized the authority of the Board, in issuing a so-called Gissel II bargaining order, to ignore a possible dissipation of majority support through employee turnover after the unfair labor practice. "(T)o require the Board to determine whether a continuing majority supports unionization," we observed, "would be to put a premium upon continued litigation by the employer" and allow the employer "to avoid any bargaining obligation indefinitely." Hedstrom v. NLRB, 629 F.2d 305 at 312 (3d Cir. 1980) (in banc) (footnote omitted), quoting NLRB v. L. B. Foster Co., 418 F.2d 1, 4 (9th Cir. 1969). In this case, the authority of the Board to act, especially when the employer has committed flagrant and egregious unfair labor practices, should, as in Hedstrom, " 'promote, and not impair, the legitimate interests of employees as a whole.' " Hedstrom, at 313, quoting Bok, The Regulation of Campaign Tactics in Representation Elections Under the National Labor Relations Act, 78 Harv.L.Rev. 38, 136 (1964).
 
 
 56
 To be sure this authority may only be exercised by the Board when the employer has committed "outrageous" and "pervasive" unfair labor practices. Only in these cases would the option of an uncoerced rerun election be clearly foreclosed.[16] Thus, we hold that the Board has the remedial authority to issue a bargaining order in the absence of a card majority and election victory if the employer has committed such "outrageous" and "pervasive" unfair labor practices that there is no reasonable possibility that a free and uncoerced election could be held.
 
 C. Direction to the Board on Remand
 
 57
 Having established that the Board has this remedial authority, we must remand for the Board to consider in the first instance whether the facts in this case rise to the "outrageous" and "pervasive" conduct which sanctions the issuance of such bargaining orders.
 
 
 58
 We are mindful of the fact that in this case the employer's conduct has been egregious to the extreme. We recognize that the Board has already found the following: Officials of United Dairy illegally threatened on at least five occasions that they would close the plant if the employees voted for the Union. On at least four occasions officials illegally professed to know for whom the employees were voting. They illegally threatened that the company would fire employees who voted for the Union and that the farmers would "smash their heads in" if the Union won. In a prior case, they had made similar illegal threats and fired a leading supporter of the Union. In this case, they again followed through on the threats by illegally firing a leading supporter of the Union immediately before the petition for an election, and later, after the election, by forcibly converting all of the employees to "independent contractors" with the purpose of bringing them outside the protection of the Act. Those six who refused the change were illegally fired. Despite all of United Dairy's efforts, the Union lost by only two votes. This type of persistent management conduct evidences a patent disregard for the right of the employees to a free and uncoerced selection of a bargaining representative that is matched by few reported cases. At this stage, however, we will not make a determination as to whether the conduct is "outrageous" and "pervasive" as specified in Gissel. It is "for the Board, not the courts ... to make (these) determination(s) based on its expert estimate as to the effects on the election process of unfair labor practices of varying intensity." NLRB v. Gissel, 395 U.S. at 612, n.32, 89 S.Ct. at 1939, n.32. We therefore remand the case for the Board to make the prerequisite finding as to whether the facts of this case embody the critical elements that would justify the issuance of a Gissel bargaining order. Compare Hedstrom v. NLRB, at 312; (reviewing type of cases which have justified issuance of bargaining order when union possessed card majority); Electrical Products Division of Midland-Ross v. NLRB, 617 F.2d at 987 (same); Rapid Mfg. Co. v. NLRB, 612 F.2d at 149-50 (same).
 
 IV.
 CONCLUSION
 
 59
 It has now been over six and a half years since the Union filed their original complaint before the Board on January 23, 1974. The Board kept the matter under advisement for over four years and regrettably this case has been before us for five months after oral argument. Despite the delay, we must regrettably remand the case for the current Board to decide whether it will take such action. If the administrative process was created as an instrumentality to expedite adjudications in labor matters, the instant case is not a model which vindicates the aspirations of those who drafted and voted for the National Labor Relations Act. We strongly urge that the Board on remand give this case its highest priority so that no further delay occurs.
 
 
 60
 For the reasons stated above we will affirm the Board's findings of unfair labor practices and other relief, but remand for reconsideration by its members, in light of our decision, on whether they wish to issue a bargaining order in the circumstances of this case.[17]
 
 
 
 [1]
 In another incident, a formal settlement was enforced by a Board Order and consent judgment of this court in United Dairy Farmers Coop. Ass'n, Case 6-Ca-4123
 
 
 [2]
 For the most part, United Dairy does not challenge on appeal the Board's evidentiary findings as to the sequence of events or the statements made by the particulars involved, although it does take issue in certain instances with the Board's interpretation of those facts and their legal importance
 
 
 [3]
 After the ballots were opened the case was returned to the Board by the Regional Director on May 6, 1975. The Board's decision was rendered on June 12, 1979
 
 
 [4]
 In particular, they stated:
 Accordingly, we shall require Respondent to post copies of the attached notice marked "Appendix A" in its Pittsburgh, Pennsylvania, facility, include it in appropriate company publications, and mail it to each and every employee of its Pittsburgh, Pennsylvania, plant, including, but not limited to, all employees on the payroll at the time the unfair labor practices were committed. All such notices, both mailed and posted, shall be signed personally by Respondent's president, Ernest Hayes, who shall also read the notice to current employees, assembled for that purpose. Respondent shall afford the Board a reasonable opportunity to provide for the attendance of a Board agent at any assembly of employees called for the purpose of reading such notices. We shall also require that Respondent publish in local newspapers of general circulation a copy of the above notice two times per week for a period of 4 weeks.
 In addition to the above remedies, which are calculated to dissipate the effects of Respondent's prior unlawful conduct, we shall also order Respondent to grant to the Union and its representatives, upon request: (1) reasonable access to its bulletin boards and all places where notices to employees are customarily posted; (2) reasonable access to employees in its plant in non-work areas during employees' non-work time; and (3) notice of, and equal time and facilities for the Union to respond to, any address made by Respondent to its employees on the question of union representation. We shall also order Respondent to afford the Union the right to deliver a 30-minute speech to employees on working time prior to any Board election which may be scheduled in which the Union is a participant. In all respects these provisions shall apply for a period of 2 years from the date of the posting of the notice provided by the Order herein, or until the Regional Director shall have issued an appropriate certification following a fair and free election, whichever comes first. Finally, we shall order Respondent to supply to the Union, upon request made within 1 year of the issuance of the Order herein, the names and addresses of its current employees.
 
 
 [101]
 LRRM at 1281-2 (footnotes omitted)
 
 
 [5]
 Member Penello also took issue with the severity of the remedial orders offered by his brethren in place of a bargaining order, although he recognized that "extraordinary remedies short of a bargaining order are clearly appropriate in circumstances such as those presented here ..." Id. at 1289 n.54
 
 
 [6]
 See Opinion of ALJ, reprinted in App. at 32a
 
 
 [7]
 United Dairy contends, in the alternative, that even if all of these illegal acts occurred, they would not justify overturning the election which the employer ultimately won 14 to 12. We lack jurisdiction to consider this claim, since a challenge to an order of the Board mandating a union election can only be raised in an enforcement proceeding for a refusal to bargain. See NLRB v. I.B.E.W., 308 U.S. 413, 414-15, 60 S.Ct. 306, 306-307, 84 L.Ed. 354 (1940); Local 542, Int'l Union of Operating Engineers v. NLRB, 328 F.2d 850, 853-4 (3d Cir. 1964)
 
 
 [8]
 United Dairy appears to argue on appeal that since it was successful in converting the status of the drivers to independent contractors, see NLRB v. A. Duie Pyle, 606 F.2d 379 (3d Cir. 1979) (discussing requirement for independent contractors status), it has not committed a violation of the Act. We need not reach that question, however, for there is substantial evidence to support the Board's finding that the forced conversion and firing was motivated by an intent to avoid unionization, and that is itself a violation of the Act
 
 
 [9]
 The other findings of the Board that United Dairy violated Section 8(a)(1) by coercively interrogating employees about their vote, threatening to close the plant down if the Union succeeded, and conveying the impression of surveillance have not been challenged by United Dairy and therefore are summarily affirmed
 
 
 [10]
 See NLRB v. Gissel Packing Co., 398 F.2d 336, 337 (4th Cir. 1968) (per curiam) (31 of 47); NLRB v. Heck's, Inc., 398 F.2d 337, 338 (4th Cir. 1968) (per curiam) (21 of 38); General Steel Products, Inc. v. NLRB, 398 F.2d 339, 340 (4th Cir. 1968) (per curiam) (120 of 207); NLRB v. Sinclair Co., 397 F.2d 157, 159 n.4 (1st Cir. 1968) (11 of 14)
 
 
 [11]
 See, e. g., Golub, The Propriety of Issuing Gissel Bargaining Orders Where the Union Has Never Attained a Majority, 29 Lab.L.J. 631 (1978); Comment, Bargaining Orders since Gissel Packing: Time to Blow the Whistle on Gissel?", 1972 Wis.L.R. 1170; Platt, The Supreme Court Looks at Bargaining Orders Based on Authorization Cards, 4 Ga.L.Rev. 779 (1970)
 
 
 [12]
 See NLRB v. Garry Manufacturing Co., 630 F.2d 934 at 945 (3d Cir. 1980); Electrical Products Division of Midland Ross Corp. v. NLRB, 617 F.2d 977, 987 (3d Cir. 1980); Rapid Mfg. Co. v. NLRB, 612 F.2d 144, 148 (3d Cir. 1979); NLRB v. Daybreak Lodge Nursing & Convalescent Home, 585 F.2d 79, 82 (3d Cir. 1978); Struthers-Dunn, Inc. v. NLRB, 574 F.2d 796, 799 (3d Cir. 1978); NLRB v. Eagle Material Handling Inc., 558 F.2d 160, 166 (3d Cir. 1977); Hedstrom Co. v. NLRB, 558 F.2d 1137, 1148 (3d Cir. 1977)
 
 
 [13]
 See J.P. Stevens Co., Gulistan Div. v. NLRB, 441 F.2d 514, 519 (5th Cir. 1971), cert. den., 404 U.S. 830, 92 S.Ct. 69, 30 L.Ed.2d 59 (1971); NLRB v. Montgomery Ward & Co., 554 F.2d 996, 1002 (10th Cir. 1977); NLRB v. S.S. Logan Packing Company, 386 F.2d 562 (4th Cir. 1967). But cf. NLRB v. Roney Plaza Apartments, 597 F.2d 1046, 1051 n.8 (5th Cir. 1979)
 
 
 [14]
 See also Rapid Mfg. Co. v. NLRB, 612 F.2d 144, 151 (3d Cir. 1979) (denying enforcement of a bargaining order and noting that election process "is by far the superior and preferred means of determining employee sentiment"); Struthers-Dunn, Inc. v. NLRB, 574 F.2d 796, 799 (3d Cir. 1978) (denying enforcement of the Board's bargaining order when union card majority had dissipated before commission of employer's unfair labor practices because of "important goal of effectively ascertaining free choice"); NLRB v. Armcor, 535 F.2d at 244 (requiring statement of reasons by the Board in issuing bargaining orders because of "the general and highly desirable practice in industrial relations of selecting bargaining representatives through traditional election processes.")
 
 
 [15]
 As Professor Bok has written:
 By indulging in unfair labor practices, the employer has made it impossible to ascertain what the decision of the majority would have been in a free election. But there is a strong possibility that the union would have prevailed, in view of the support which it had already gained among the employees. Although the Board could order an election after ruling on the unfair labor practices, such an election might not provide an accurate indication of what would have occurred but for the employer's violations, both because changes in personnel may have seriously altered the composition of the unit and because of the lingering effects of the serious unfair practices. Under these circumstances, it would be consistent with accepted remedial principles to prevent the employer from capitalizing on the uncertainty created by his own unlawful acts and to resolve even substantial doubts against him by conferring representative status on the union. See, e. g., Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 265, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946).
 Bok, The Regulation of Campaign Tactics in Representative Elections Under the National Labor Relations Act, 78 Harv.L.Rev. 38, 138-9, n.274 (1964). See also Golub, supra, note 11, at 639.
 
 
 [16]
 We need not decide at this time whether the Board lacks the authority to issue a bargaining order when there is no reasonable possibility that the union would have attained an election majority but for the action of the employer. See generally Bok, supra note 15, at 138-9; Golub, supra note 11, at 639. In this case, where the employer had committed numerous flagrant and serious violations, and the Union lost by only two votes, a reasonable possibility exists
 
 
 [17]
 Our affirmance of the Board's remedies does not preclude the Board from altering its choice of remedies on remand