Jackie KLEINER, et al.

v.

The FIRST NATIONAL BANK OF ATLANTA.

George MOROSANI, et al.

v.

The FIRST NATIONAL BANK OF ATLANTA.

Civ. Nos. C80–921, C81–1553.

United States District Court,
N.D. Georgia,
Atlanta Division.

Nov. 8, 1983.

Robert B. Remar, Jonathan A. Zimring, Remar, Arnold & Zimring, Jerome J. Froelich, Jr., Kenneth P. McDuffie, Atlanta, Ga., for plaintiff Kleiner.

Jerome J. Froelich, Jr., Kenneth P. McDuffie, Atlanta, Ga., Michael P. Malakoff, Pittsburgh, Pa., for plaintiff Morosani.

Richard M. Kirby, Hansell, Post, Brandon & Dorsey, Richard M. Langway, Marilyn D. Britwar, Legal Department, Atlanta, Ga., for First Nat. Bank of Atlanta.

## ORDER

ORINDA D. EVANS, District Judge.

In this Memorandum Opinion, the Court will further explain and supplement its rulings announced from the bench at an evidentiary hearing held in the above-captioned class actions on October 5 through 7, 1983. The purpose of that hearing was to determine whether a massive telephone campaign in which Defendant solicited exclusion requests from about 4,000 prospective class members was improper and if so, (1) whether the extent of the improprieties justify remedial action or imposition of penalties against Defendant; (2) whether the involvement of the Bank's counsel of record, either as advisor or participant in the telephone campaign, was such that

sanctions against counsel are appropriate; and (3) precisely what remedy, penalties, or sanctions, if any, are appropriate. As is set forth more fully below, the Court does find that the telephone campaign was highly improper; that due to the circumstances strong remedial action must be taken and penalties imposed; and that because the conduct of the Bank's counsel was a willful disregard of their responsibilities to the Court and opposing counsel, sanctions and penalties are appropriate.

## I. FINDINGS OF FACT

The Court hereby makes the following findings of fact:

On April 15, 1983, 97 F.R.D. 683, certain breach of contract claims were certified for class action treatment in the above two consolidated cases. Certification was under Rule 23(b)(3), Fed.R.Civ.P. The contracts involved are form notes which have been or are used by the Bank for commercial lending purposes. The members of the three certified classes are past and present customers of the Bank who signed one or more of the form notes in question.

Lead counsel for the Bank throughout the litigation has been Richard M. Kirby, a partner in the Atlanta law firm of Hansell & Post. Both Mr. Kirby and his firm have considerable experience in commercial class action litigation. For many years the law firm has served as general counsel to the Bank, which is one of its major clients.

On May 20, 1983, the Court held a conference to discuss a number of substantive and procedural matters in the case. Just prior to the conference, Plaintiffs filed a Motion for a Protective Order. The motion sought to stop Defendant from deposing 25 prospective class members.

The following colloquy ensued between the Court, Plaintiffs' counsel Messrs Froelich and Remar, and Defendant's counsel, Mr. Kirby:

> The Court: ... Are these individuals [served with notice of deposition] people that you have already been in contact with?

Mr. Kirby: We served subpoenas on them.

The Court: But I mean other than that.

Mr. Kirby: We did not contact, no, we did not contact them prior to serving subpoenaes.

The Court: And say would you be willing to give a deposition?

Mr. Kirby: That is correct. Some of them called me after they got a subpoena served on them with my name on it. They were not contacted prior to being served with a subpoena.

Mr. Froelich: ... I believe that essentially before the class notice goes out, this is a very, very chilling effect, and we are now having contact by defense counsel with what is really our clients before we have had the opportunity even to contact those clients, and ... this is ..., I think, a way of attempting to, you know, break the class....

\*　　\*　　\*　　\*　　\*　　\*

The Court: I am not really disturbed about the prospect of contacts in this case. I guess I am a little bit worried about all of you using up your time sitting at depositions .... Why ... wouldn't it do just as well for the Bank to talk to these people, get affidavits if you want to....

\*　　\*　　\*　　\*　　\*　　\*

Mr. Kirby: I will be more than happy to do it on that basis.

Mr. Froelich: .... I have real problems with that to be honest with you.

The Court: Okay.

Mr. Froelich: In effect, they are our clients, and, one, the Bank has all their documents. They are asking for the loan document they have with the Bank. The Bank has that. There is no reason to subpoena loan documents from these people.

The Court: That is my thought also.

Mr. Froelich: And second of all, your Honor, I have great problems with the Bank being able to go out and contact our clients without our even knowing them.

The Court: Wasn't there a Supreme Court decision that basically—well, I guess it was dealing with the question of whether counsel for the class could contact absent class members.

Mr. Remar: Your Honor, that was Bernard-vs-Gulf Oil and had to do with whether the court could enter a standard order prohibiting plaintiffs from contacting absent class members and the Supreme Court said absent specific findings, such a blanket order would not be entered. I don't think the court addressed the ethics of the defendant contacting unnamed class members, particularly prior to the notice and opt out period.

Mr. Froelich: .... I think people are very, very afraid of their credit ratings and their ability to borrow money, especially businessmen, and when people start knocking on their door and say do you want to give me an affidavit on this or do you want to talk to me about this, they are likely to agree to just about anything.

\* \* \* \* \* \*

The Court: What do you have to say about that? I guess—was the theory that of the attorney/client relationship, it wasn't a free speech deal?

Mr. Kirby: It was a first amendment case.

Mr. Remar: In actuality, the Former Fifth Circuit decided on first amendment grounds. The Supreme Court in essence decided it on Rule 23 grounds saying it was not contemplated by Rule 23 that the Court issue a blanket prohibition order, that the court had the intrinsic power to make such orders if it made specific findings. That case dealt, however, only with plaintiffs contacting members of the class for solicitation and other purposes.

\* \* \* \* \* \*

The Court: Are they right about the law? They say it would be unethical, improper for you all to contact absent class members outside their presence.

Mr. Kirby: I don't think that is the law. I don't think that is the law under any reasonable reading of the First Amendment, ....

After the foregoing colloquy, the Court ruled as follows:

At this time, I am going to let [Defendant's counsel] take no more than five depositions. Otherwise, I am granting the motion for a protective order. However, if you can get me some law that convinces me that it is all right for you to otherwise be able to contact class members, then I will permit you to contact additional people informally.

Tr. of May 20, 1983 hearing at 28–29. Further, the Court directed that counsel coordinate efforts so that both sides could interview the deponents prior to the depositions, with Plaintiffs' counsel having the initial interview. At the close of this hearing, it was clear that, *except for five prospective class members,* no other prospective class members could be contacted by counsel for Defendant *until the Court ruled otherwise.*

Another topic raised at the May 20 conference concerned the portion of the class notice [1] which tells prospective class members how to get further information about the case. Defendant's draft would have required that inquiries be in letters addressed to the Clerk of the Court. Plaintiffs' counsel thought this would be burdensome to the Clerk; he suggested that all such inquiries be addressed to him. That discussion concluded as follows:

Mr. Kirby: Well, I would request that if they are given in that notice the direction or opportunity to address written inquiries to Plaintiff's counsel, that they be given that same opportunity if they choose to take it to address inquiries either to the Bank or to the Bank's counsel.

---

1. After class certification, counsel for both sides were directed to meet and prepare a form of notice to class members. When counsel were unable to agree, each side filed its own suggested notice. After reviewing them, the Court selected Defendant's form notice with some changes.

The Court: Well, I think before I make up my mind about that, I will need the law that you are going to give me. So, at this point, subject to revision, but at this point my decision is that the class notice should be redrafted to state that all inquiries should be directed to Plaintiff's counsel with addresses, and that they should be in writing, and postmarked no later than whatever date you all feel is appropriate.

Tr. of May 20, 1983 hearing at 45.

The Bank filed a brief on June 23, 1983, arguing that they were free to contact absent class members unless Plaintiffs were able to show "a likelihood of serious abuse." Brief at 3. Further, it argued that class members were not parties represented by counsel for purposes of DR 7–104(A)(1) of Canon 7 of the ABA Code of Professional Responsibility, so that it would not be unethical for defense counsel to communicate with or cause the Bank to communicate with them.

On June 29, 1983, an Order was entered approving a class notice, a copy of which was attached to the Order. The class notice, which was prepared in final form by the Court, provided in part as follows:

> 10. *Questions To Be Directed To Either Plaintiffs' Counsel or Defendant's Counsel*
>
> Please address all inquiries you may wish to make about this action to either or both of the below listed persons:
>
> (1) Plaintiffs' counsel—Jerome J. Froelich, Jr., Suite 1500, 2 Peachtree Street, Atlanta, Georgia 30383;
>
> (2) Bank's counsel—Richard M. Kirby, Hansell & Post, 3300 First Atlanta Tower, Atlanta, Georgia 30383.
>
> All such inquiries and communications must be in writing and must be postmarked no later than July 20, 1983.[2]

The next day, the Court *sua sponte* entered the following Order:

> On June 29, 1983 the Court entered an Order approving the class action notice to be sent to class members in these cases. In Paragraph 10 of the approved Notice, class members are told that they may address written inquiries concerning this action to either or both of counsel for the Plaintiffs and counsel for the Bank by no later than July 20, 1983. The Court hereby enters this further Order as follows:
>
> Counsel for Plaintiffs and counsel for the Bank, upon receiving correspondence from class members pursuant to Paragraph 10 of the Notice, are directed to provide copies of all such correspondence, together with the proposed replies, to opposing counsel before such replies are mailed to the inquiring class members.

The Court is in receipt of the letter briefs from counsel concerning the issue whether the Bank's counsel may initiate contact with class members beyond the limited reply to class member inquiries under Paragraph 10. The Court is considering the arguments therein and will rule on the question in a future order.

On July 11, 1983, Plaintiffs filed "Plaintiffs' Memorandum in Opposition to Defendant's Request to Initiate Contact with Absent Class Members." This brief again reiterated the assertion that Bank counsel's initiating informal, *ex parte* contacts with prospective class members would violate DR 7–104.

Mailing of the class notice was deferred for approximately a month while the parties were engaged in settlement negotiations. During this hiatus, Thomas Chapman, the Bank's Director of Corporate Marketing Services, was instructed by the Bank's President Raymond Riddle to begin working on a standby "communications program"[3] in the event settlement negotia-

---

**2.** This date was later changed to August 27, 1983.

**3.** According to Defendant's President, he gave general instructions to develop "a broad based plan of communications." He testified he felt

more specific instructions were not needed, as he regarded Mr. Chapman as a "professional." (Transcript of October 5, 1983 hearing at 342) ("Tr."). Mr. Riddle said he felt if the customers knew the facts, they would not want to sue the Bank. (Tr. at 344).

tions failed. Pursuant to that direction, Mr. Chapman met with Mr. Kirby and with Richard Langway, General Counsel and Secretary of Defendant corporation. This meeting occurred in July 1983. Mr. Chapman either was already aware, or thereby became aware, of the fact that opt-out requests were the key to reducing the Bank's potential exposure in the lawsuit. He inquired whether the Bank could use its personnel to actively solicit exclusion requests from customers. The Court infers Mr. Kirby told him that possibility existed, but he would have to look into the matter.

As a lawyer experienced in class action litigation, Mr. Kirby knew that *ex parte,* unsupervised solicitation of exclusion requests is not permitted in class actions, and is antithetical to the objectives of Rule 23, Fed.R.Civ.P., which assume and require Court control of the class notification process. He knew of no legal precedent permitting such solicitation; indeed, none exists.[4] Further, he knew such solicitations would be a breach of an established code of conduct which exists among members of the bar in class action litigation. 2 Newberg on Class Actions, § 2720d, at 1189 (1977 ed.). He also knew that Local Rule 221.2 provides in pertinent part:

*Counsel Forbidden To Communicate.* In every potential and actual class action under Rule 23 of the Federal Rules of Civil Procedure, all parties thereto and their counsel are hereby forbidden, directly or indirectly, orally or in writing, to communicate concerning such action with any potential or actual class member not a formal party to the action without the consent of, and approval of the communication by order of, the Court .... *The communications forbidden by this rule, include, but are not limited to:*

\* \* \* \* \* \*

221.23 *solicitation by formal parties to class action of requests by class members to opt out in class actions* under subparagraph (b)(3) of Rule 23 of the Federal Rules of Civil Procedure. (emphasis supplied).

He also knew the Court had ordered him not to contact prospective class members, except for 5 persons.

However, Mr. Kirby had read *Bernard v. Gulf Oil Company,* 596 F.2d 1249 (5th Cir.), *reh'g en banc granted,* 604 F.2d 449 (5th Cir.1979), *rehearing en banc,* 619 F.2d 459 (5th Cir.1980), *cert. granted,* 449 U.S. 1033, 101 S.Ct. 607, 66 L.Ed.2d 495 (1980), *aff'd,* 452 U.S. 89, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981).[5] This case was not one

**4.** In *Weight Watchers of Philadelphia, Inc. v. Weight Watchers, International, Inc.,* 55 F.R.D. 50 (E.D.N.Y.1971), *appeal dismissed and mandamus denied,* 455 F.2d 770 (2d Cir.1972), the trial judge permitted negotiations of individual settlement agreements with absent class members under strictly supervised conditions, *e.g.,* with counsel representing each absent class member. This case, cited by Defendant, does not support an argument that Rule 23 contemplates or supports unilateral, unsupervised solicitation of exclusion requests. Neither does *Rodgers v. United States Steel Corp.,* 536 F.2d 1001 (3rd Cir. 1976), which is a case where the Defendant was permitted, *with advance court approval,* to solicit releases from employees under a consent decree negotiated by the Justice Department in another action.

**5.** A full discussion of the opinions of the Fifth Circuit and the Supreme Court is contained in a continuation of this footnote which has been placed at the end of the Order due to its length.

In 1979–1980, the Court of Appeals for the Fifth Circuit considered an appeal from a judgment which had been entered by a Texas district court in *Bernard v. Gulf Oil Company.* That case, which involved claims under Title VII and 42 U.S.C. § 1981, was brought as a class action, though apparently never certified as such. At an early point in the litigation, the trial judge had issued a broad injunctive order prohibiting communications with prospective class members. It was closely modeled after the form order suggested by the *Manual for Complex Litigation,* Part II, § 1.41 (1973 ed.) for use in class actions. The order had the effect of preventing plaintiffs' counsel from communicating with prospective class members at a point in time when Gulf, in conjunction with the EEOC, was seeking settlement agreements with individual class members. Plaintiffs' counsel had tried, unsuccessfully, to obtain relief from the injunctive order. The trial court then granted Gulf's motion for summary judgment; final judgment was entered and the appeal ensued.

The Fifth Circuit first decided that the district court had incorrectly granted summary judgment in favor of defendant. *Bernard v. Gulf Oil Company,* 596 F.2d 1249, 1254–58 (5th Cir.1979).

where solicitation of exclusion requests was an issue (certification was sought un-

der Rule 23(b)(2), Fed.R.Civ.P.), but it was one where the Court of Appeals for the

The court then turned to a collateral issue raised by plaintiffs on appeal, namely whether the injunctive order had been proper. After the panel decided that the injunctive order had been "a permissible exercise of the trial court's discretionary power in controlling a class action," *id.* at 1259, (Judge Godbold dissented from the panel opinion), the Court of Appeals decided to consider that issue *en banc. Bernard v. Gulf Oil Company,* 604 F.2d 449 (5th Cir.1979). In its *en banc* decision the court held that the broad injunctive order "violated the First Amendment to the Constitution and Rule 23, Fed.R.Civ.P." *Bernard v. Gulf Oil Company,* 619 F.2d 459, 463 (5th Cir.1980) (Godbold, Jr. majority opinion; Tjoflat, J. with whom Brown, Gee, Henderson and Reavley, Judges, join, specially concurring; Fay, J., with whom Coleman and Roney, Judges, join, special concurring statement; Hill, J., dissenting).

More specifically, the majority opinion found that the injunctive order was an unconstitutional prior restraint. It noted that a good faith belief in the constitutionally protected status of speech arguably constitutes a defense in a contempt proceeding. *Id.* at 470. However, the Court found that the chilling effect on First Amendment rights was not adequately relieved by the possible availability of the "good faith" defense. It also noted that the speech prohibited by the order included protected speech, namely, speech calculated to vindicate the civil rights of black persons. While the court acknowledged that Rule 23, Fed.R.Civ.P., gives the trial court power to manage a class action, it found that the injunctive order was broader than was necessary to achieve Rule 23 objectives, noting:

> ... the potential abuse rationale is at odds with the requirement that a prior restraint is only justified in exceptional circumstances and by a showing of direct, immediate and irreparable harm. Whether such a showing can be made may be affected by a host of factors: the occurrence of misconduct or the threat of it, the composition and size of the class, the nature of the claim, the historical policies of the district court in administering class actions, the identity, experience and standards of the lawyers, the mores of the bar, the necessity for discovery and many others.

*Id.* at 476.

However, the court made clear its reasons for rejecting the necessity for broad injunctive relief in the particular case before it. It pointed out that the four major abuses anticipated by the Manual for Complex Litigation were not considerations in that case, which was a pro bono Title VII case where class members would not be permitted to request exclusion, *i.e.,* certification was sought under Rule 23(b)(2), Fed.R. Civ.P. Specifically, the court noted that (1) so-

licitation of clients, (2) solicitation of funds by counsel, (3) solicitation of opt-out requests and (4) misrepresentation of facts were not matters of concern or relevance on the record before it, noting:

> Solicitation of clients is protected here under [*NAACP v.* ] *Button* [371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) ] and [*In re* ] *Primus* [436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978) ]. *See* pp. 471–473, *supra.* The possibility of solicitation of funds is controverted by affidavits. *See* n. 25 *supra. Solicitation of opt-out requests is not relevant to this Rule 23(b)(2) case.* Finally, nothing justifies any inference in this case that communications are likely to "misrepresent the status, purposes and effects of the ... action and of ... [the] Court orders therein."

*Id.* at 476. (emphasis supplied).

A number of years prior to the Fifth Circuit's decision in *Bernard,* the United States District Court for the Northern District of Georgia had adopted Local Rule 221.2, which is a broad prohibition against communication with actual or prospective class members in class actions. It too is modeled after the order suggested in the Manual for Complex Litigation, and thus is similar in most respects to the order entered by the Texas district court in *Bernard.*

Following announcement of the Fifth Circuit's decision in *Bernard,* two of the eleven judges in the Northern District of Georgia had occasion to consider the validity of Local Rule 221.2 in light of that decision. Both cases were Title VII cases; both involved requests for relief from the Rule by plaintiffs' counsel. In one case, *Kilgo v. Bowman Transportation, Inc.,* 88 F.R.D. 592 (N.D.Ga., 1980), Judge Shoob vacated an order he had entered supplementing the referenced local rule and expressly ordered that class communications would be allowed, it appearing that no abuse of the class action process was occurring or was imminently threatened. Thus Judge Shoob's order implicitly found the local rule invalid, at least as applied. In *Nation v. Winn-Dixie,* No. C80–1468 (N.D.Ga., May 12, 1981) (unpublished opinion; copy attached to this Order), the undersigned applied *Bernard* and found: "The conclusion that the Fifth Circuit's ruling in *Bernard* invalidates this Court's Local Rule is inescapable, and the Court therefore declares such Local Rule to be invalid and unenforceable." The Court on its own motion, however, went on to impose certain limitations on a planned meeting between plaintiffs' counsel and Winn-Dixie employees. Noting the possibility that class notices and exclusion requests would be sent to employees in the near future, (certification was sought under either subsections (b)(2) or (b)(3) of Rule 23, Fed.R.Civ.P.), the Court found it would be "inappropriate and damaging to the fair administration of justice

Fifth Circuit had found that a broad "no communications" injunctive order violated First Amendment guarantees, where the order had barred plaintiffs' counsel from communicating with members of the plaintiff class. Mr. Kirby recognized that if the Fifth Circuit's holding could be deemed applicable to this case, one might argue that: (1) Local Rule 221.2 was unconstitutional and (2) the Court had no power to enjoin contacts with prospective class members, absent evidence of prior or threatened abuse.

Mr. Kirby went to see Trammell Vickery, the head of his firm's litigation department, and asked for his opinion. At this time, Mr. Vickery was not counsel of record in the case, and had only general familiarity with it. He initially told Mr. Kirby that he advised against the course of conduct,[6] based on "the broader tactical ramifications." (Tr. at 516). However, Mr. Kirby indicated he still wanted his opinion on the legal and ethical questions presented. In response to a direct question from Mr. Vickery, Mr. Kirby indicated there was no order in the case of any kind which bore on

resolution of the issue. The two then turned to discussion of Local Rule 221.2. At Mr. Kirby's request, Mr. Vickery read both the Fifth Circuit and Supreme Court decisions in *Bernard*. He indicated he felt the Fifth Circuit's opinion did render the local rule invalid. He therefore opined that there was no impediment to communicating with prospective class members as long as the communications were truthful and non-coercive.

■ Mr. Kirby and Mr. Vickery expressly discussed the question of whether or not Mr. Kirby should seek the Court's permission before their client contacted prospective class members. Both of them testified they rejected the idea for two reasons. First of all, they testified they felt it would be an improper shifting of responsibility from counsel to the Court. Secondly, they both testified that it would have been a wasteful gesture to consult the Court, because even if the Court disagreed with the proposed plan of action, it had no power to enjoin communications in the absence of evidence of prior or threatened abuse.[7]

---

... for such persons to attend a one-sided presentation of the objectives and possible benefits of the pending lawsuit."

In June 1981, the United States Supreme Court affirmed the Fifth Circuit's ruling in *Bernard*, but only on one of the grounds set forth in the Fifth Circuit's *en banc* opinion. *Gulf Oil Company v. Bernard*, 452 U.S. 89, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981). The Supreme Court found that the injunctive order exceeded the district court's power under Rule 23, and that its entry therefore had been an abuse of discretion. The Court stated:

Although we do not decide what standards are mandated by the First Amendment in this kind of case, we do observe that the order involved serious restraints on expression. This fact, at a minimum, counsels caution on the part of a district court in drafting such an order, and attention to whether the restraint is justified by a likelihood of serious abuses. *Id.* at 103–104, 101 S.Ct. at 2201.

The Court further indicated: "We also note that the rules of ethics properly impose restraints on some forms of expression. *See, e.g.,* ABA Code of Professional Responsibility, DR7–104 (1980)." *Id.* at 104 n. 21, 101 S.Ct. at 2202 n. 21.

Local Rule 221.2 of this Court has never been repealed, and as of today, still is found in the local rules of this Court. The referenced local

rule is, however, being reconsidered as part of an ongoing revision of all of the Court's local rules. Mr. Kirby, at relevant times herein, was aware of the holdings of the Supreme Court and the Fifth Circuit in *Bernard,* and aware of Local Rule 221.2. He was, however, unaware of the above-described orders in *Kilgo* and *Nation* until after completion of the "class communications campaign" described in this Memorandum Opinion.

6. Actually, it is not totally clear what course of conduct the two were discussing. Specifically, it is not clear whether the matter under discussion was the solicitation of opt-outs or merely the general topic of contacts between the Bank and absent class members concerning the litigation. *See* testimony of Mr. Vickery, (Tr. at 514–71).

7. The Court finds this conversation did occur; however, it expressly declines a finding that either of these gentlemen, who are known by the Court to be experienced, smart lawyers, had a good faith belief in the validity of these reasons, absent explicit consideration of the precise nature, substance, and timing of the planned "communications program." Unsupervised, covert solicitation of exclusion requests is *per se* an abuse. The *Bernard* case itself implicitly recognizes that solicitation of exclusion requests

In the meantime, Mr. Chapman was organizing a possible communications campaign directed toward customers, the media, and employees. In an August 3, 1983 memorandum[8] to Thomas R. Williams, Chairman of Defendant's Board of Directors, Mr. Chapman noted the following:

*The Customer.* Since we cannot communicate with the class until the mailing drops sometime between August 5 and August 13, we must be prepared to move swiftly once the "opt-in or out" hits the street. The best that can happen is for these individuals to contact FATL seeking information about what has happened to them. That's the good news. The bad news is that the Legal Department is very carefully reviewing what can be said to them in responding to their questions regarding the suit. Since they must take overt action by filling out the form to opt-out of the class, we need to effectively, but legally, respond to the questions and communicate advice. Messrs. Langway and Kirby are providing such recommended dialogue now. They are also examining what communication can be directed, if any, toward them following the mailing of the class notice. The most effective communication is going to be our personnel (one-on-one) response and this will be dealt with in the employee portion of the game plan.

On August 8, 1983, Mr. Kirby and Mr. Langway were summoned to attend the regular weekly meeting of the Bank's senior management group. The Bank's President and Chief Financial Officer were not present; however, the Chairman of the Board of Directors and the Bank's Executive Vice President were. Mr. Kirby gave an update on the status of the *Kleiner* litigation. He showed those present the class notice, and informed them it would be mailed on Saturday, August 13. Mr. Williams asked Mr. Kirby whether the Bank could legally initiate contacts with prospective class members. The response was that there was no prohibition against such contacts if they were "noncoercive and truthful." Mr. Kirby went on to point out that such a program of class contacts was bold and virtually unprecedented; and indeed, although he was willing to opine that the program was legal, the question was by no means free from doubt. In response to Mr. Williams' question, Mr. Kirby then went on to outline his view of the downside risks. He pointed out that he had read a case in which a court had voided all exclusion requests and ordered that a new corrective notice be sent out, at defendant's expense, where the court found solicitation of opt-outs had been improper. Further, Mr. Kirby noted that the trial judge would be very angry on learning of the campaign. Indeed, the possibility that the campaign would be enjoined was discussed.[9]

Mr. Williams, who was aware of the possible financial benefits to the Bank from such a campaign, weighed the risks and found them acceptable.[10]

The discussion then turned to the practical aspects of the matter, along the lines suggested in Mr. Chapman's August 3 memorandum. By the time the meeting concluded, it had been agreed among those present that the Bank would use its personnel to solicit exclusion requests from customers, and that Mr. Chapman would coordinate the solicitation campaign with the assistance of Mr. Kirby and Mr. Langway.

Mr. Kirby decided not to notify the Court of the planned solicitation campaign. The Court finds he did so because he knew that permission would be denied. He also decid-

---

is abusive. *Bernard,* 619 F.2d 459, 476 (5th Cir.1980).

**8.** The memorandum is captioned "GAME PLAN FOR KLEINER SUIT." *See* Plaintiffs' Exhibit 10.

**9.** This statement was made to Richard Langway either at that meeting or following it.

**10.** The record does not expressly reflect whether Mr. Williams considered the fact that a second notice following closely behind the first (the trial is scheduled to begin on November 28, 1983) would be a relatively inefficacious remedy. More likely than not he did. Otherwise, Defendant's decision to proceed on a reckless course of action without prior Court approval makes no sense.

ed not to contact opposing counsel, although he knew they had no inkling of what was about to transpire.

In the next several days, Mr. Chapman, with the help of a public relations consultant, drafted a number of documents to be used in the campaign. The most pertinent are a letter to employees to be signed by the Chairman of the Board, plus a Customer Questions and Answers sheet to be distributed to loan officers who would be soliciting exclusion requests.[11] Drafts of these documents were reviewed and approved by Mr. Kirby and Mr. Langway. These documents are in evidence as Plaintiffs' Exhibits 6 and 7. Both of these documents were designed to give employees purported "facts" to use in conversations with potential class members.

Some of the information provided in these documents is factual, and does not appear to have been misleading in context either. For example, the Questions and Answers sheet provides information as to the names of the law firms representing Plaintiffs and Defendant. However, some of the information set forth is either misleading in context or suggestive in an improper manner. For example, the suggested answer to a customer's question as to what Kleiner's "charges" against the Bank are is that his "charges" are "fraud and breach of contract." While that is true in a broad brush sense,[12] the only claims which have been certified for class action treatment are breach of contract claims. A prospective class member receiving information about these referenced "charges" from a bank officer would incorrectly conclude that joining the class action would mean he or she would be asserting a fraud claim against the Bank.

The Questions and Answers sheet incorrectly and improperly suggests also that if the customers want to make sure that Kleiner has no further access to their confidential records, that result can be achieved by excluding themselves from the class action, as follows:

7. Q: How much do Kleiner and his attorneys know about me?

A: The court required that the Bank provide the following information: your name and address; how much money you borrowed and when; and the interest rate you paid.

8. Q: If a customer chooses not to exclude himself, would Kleiner then have access to information related to his account?

A: Yes, if it was relevant to the lawsuit.

Question and answer No. 19 are very misleading. They state the following:

19. Q: What is your definition of Prime? If you're not guilty, why did you change your Prime Rate definition?

A: The prime rate is the rate we announce as our prime rate. We changed some of the wording in our note form to limit the size of the class.

It is not clear whether the Bank is giving its definition of "prime rate" after the 1981 change in its note forms, or rather the definition applicable to the note forms at issue in the pending litigation. If the latter, the failure to label this statement as the Bank's contention is extremely misleading. Whether "prime rate" is interpreted as "announced rate" under the pre-1981 note forms is a major issue in this case.

Plaintiffs' Exhibit 7, Mr. Williams' letter to all employees, has similar statements in it which are misleading if used as a source of information to prospective class members. Most objectionable is the letter's assertion that "First Atlanta denies any such breach of contract because Mr. Kleiner and the Bank *agreed* that his interest was to be tied to the announced prime rate ...." (emphasis in original). Again, the legal (and possibly factual) import of the agree-

---

**11.** Copies of these documents are attached to this Order.

**12.** Claims are asserted under the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*

ment is a major issue in this lawsuit.[13] Asserting that the relevant part of the agreement is factually undisputed unfairly trivializes Plaintiffs' claims. While the Bank could ultimately be proven correct, it is grossly unfair to characterize this as an established fact.

In order to facilitate implementation of the solicitation program, Mr. Kirby took his list of prospective class members to the Bank's computer center. He assisted computer personnel in setting up a program which would reproduce the list in such a way as to facilitate dividing it up appropriately among various divisions of the Bank. Further, Mr. Kirby attended several organizational meetings with divisional managers of the Bank to assist in organizing the solicitation program.

Testimony was given about one of these planning meetings which was held on Tuesday, August 9, by Thomas K. Kilpatrick, who attended the meeting in his then capacity as officer in charge of Commercial Accounts Management in the South Metro Division. Joe Weingartner, head of the South Metro Division, presided. Present were the various banking center managers and certain staff personnel within the South Metro Division. According to Mr. Kilpatrick, whose testimony is credited by the Court, Mr. Weingartner indicated first that the meeting was off the record. He then passed out sheets of paper containing lists of customers and asked the officers to go through the lists and mark customers "friend" or "foe," with the designation to reflect the officers' judgment of the customer's current disposition toward the Bank. Mr. Kirby and Mr. Langway were not in attendance at this particular session.

On Thursday, August 11 at 8:30 a.m., the Bank held a group instructional session for the approximately 175 loan officers who would be making the customer contacts. Loan officers were notified orally of this meeting. As they entered the meeting room, each loan officer was given a copy of the letter to all employees signed by Mr. Williams, plus the customer question and answer sheet and a copy of the court-approved notice which was going to be mailed on Saturday, August 13. Those in attendance included the Chairman of the Bank's Board of Directors, Mr. Williams; its Chief Financial Officer; and the Bank's Executive Vice President. Additionally, the meeting was attended by Mr. Kirby and Mr. Langway.

The meeting was opened by a brief talk by Mr. Williams, who read out loud the previously discussed letter to all employees. He told the officers they were about to receive instructions concerning a "communications program" in connection with the Kleiner litigation; that the matter was top priority; and, that the legality of the program had been passed on by counsel for the Bank. He exhorted the officers to listen carefully to the information they were about to receive, and thanked them for attending. At that point, the Chairman, the Chief Financial Officer, and the Executive Vice President arose and departed en masse, leaving the Bank's Marketing Director, Mr. Chapman,[14] in charge.

Mr. Chapman, who was described as "a motivational type person," (Tr. at 26), then moved into his sales pitch. Drawing on the text of Mr. Williams' letter to employees, Mr. Chapman emphasized how the corporate integrity of the Bank was at stake. He urged the officers not to be shy when talking with prospective class members; to "have a point of view." (Tr. at 205–206). He said they had to "do the best selling job that [they] had ever done." (Tr. at 27).

Mr. Chapman referred numerous times to the necessity of being "factual" with the customers. However, he provided them with no facts beyond those listed in the

---

13. Various notes forms are involved in this litigation; the "prime rate" language varies from note to note. None of the notes flatly state that the prime rate is defined as whatever rate the Bank announces. However, the Bank is arguing that such is the correct legal interpretation taking into account the language of the note as a whole, plus alleged custom and trade practice.

14. Mr. Chapman is also an Executive Vice President of the Bank.

Questions and Answers sheet, the letter to employees, and the class action notice. Indeed, Mr. Chapman himself knew little about the lawsuit except what was contained in the materials distributed at the meeting.[15]

Chapman asserted that the program's purpose was to maximize customers' understanding of the "facts" so as to minimize their confusion upon receiving the class notice. He stated that loan officers were going to personally contact individual customers to make sure that they were not confused and that they understood the mechanics of opting out. He stated that the loan officer most familiar with each individual customer would be the one to make the contact.

Mr. Chapman also conveyed a sense of urgency to those present. He indicated they should leave the meeting, get their particular assignment lists, go back to their desks and begin making their phone calls immediately. All other work should be put aside. He emphasized that they should not discuss what they were doing with anyone. He stated that the program was bold and innovative, in fact, so innovative that it might be called to a halt at any time; thus, time was of the essence.

After Mr. Chapman's presentation, brief remarks were made by Mr. William Deyo, Jr., who is head of the Metropolitan Banking Division and by Mr. William Farr, head of the Bank's Commercial Division. Mr. Deyo then stated that the group would break up into small groups to receive their contact assignments.

When the loan officers left the group meeting, everyone present had gotten the implicit but clear message: by use of whatever technique worked best with a given customer, they were to get a commitment to opt out of the class.

Testimony was given by Mr. Kilpatrick concerning the smaller group meeting he attended. The South Metro Division head, Mr. Weingartner, passed out lists to get input as to which loan officer would be the best person to contact a given customer. Mr. Weingartner reiterated a statement which had been made by Mr. Chapman in the large meeting to the effect that there should be no arm twisting or coercion of any customers; however, he similarly communicated "between the lines" that the objective was to convince customers to opt out of the class action.[16]

The loan officers were instructed to identify the largest loans and to make contacts with those customers first. Also, they were told to prioritize calls to those customers who they felt would most favorably receive the calls; antagonistic customers should not be contacted at all. Tally sheets were passed out which had columns in which officers could indicate aggregate dollar amounts represented by calls which yielded both positive and negative results, i.e., a commitment to opt out or not. The officers were told to call a central reporting location each day by 4:00 to report the

---

**15.** Mr. Chapman testified he did not know whether or not there was a fraud claim pending, (Tr. at 186), and that he knew little about the court proceedings. (Tr. at 231).

**16.** Mr. Kilpatrick, who is a member of the Bar, told Mr. Weingartner he had some concerns about the program which was being proposed. He pointed out to Mr. Weingartner that the class notice, which he had reviewed, gave specific direction to the manner in which inquiries from class members were to be handled. He further questioned the wisdom of engaging in conduct which the Bank expressly acknowledged might be enjoined by the Court. The comments angered Mr. Weingartner, and at Mr. Kilpatrick's suggestion, further discussion was deferred. Mr. Kilpatrick left the Bank early

that day and did not make his assigned calls. The next Tuesday, August 16, Mr. Weingartner requested that Mr. Kilpatrick meet with him. Mr. Kilpatrick told him that he had thought the matter through again, and that he was willing to contact customers, but not to apply any sales pressure in order to get them to exclude themselves from the class. Mr. Weingartner's response was that that was not sufficient; either Mr. Kilpatrick had to participate in the program as outlined "or find yourself something else to do." (Tr. at 54). On August 17, 1983, Mr. Kilpatrick sent a letter of resignation to the Bank stating he was resigning rather than agreeing to participate in the class communications program.

positive and negative dollar amounts shown on their tally sheets.

After these meetings, the Bank had hundreds of copies of the class notice and exclusion request forms reproduced. These copies were distributed, along with a stock of plain white envelopes, to the various banking centers. In that manner, a customer who demurred on the excuse that he had misplaced the exclusion form could be immediately confronted with the availability of an extra form. Also, those customers who found it inconvenient to mail their exclusion request form to the Clerk of the Court could send it to their loan officer, who (presumably after taking note of the customer's compliance with the Bank's request) would mail it in.

Senior management personnel met on the afternoon of Friday, August 12, to discuss the results of the solicitation campaign thus far. Mr. Kirby and Mr. Langway were in attendance. The results were overwhelmingly positive from the Bank's point of view. Over 3,000 calls had been made; almost all customers had made tentative commitments, at least, to opt out of the class. As of this time, the class notices had not even been mailed out. They were mailed on the following day, Saturday, August 13.[17]

On Wednesday, August 24, 1983, the Court enjoined any further communications between counsel or parties for either side and prospective class members pending further order of the Court. A hearing was set for October 5, 1983, at which time the Court indicated it would receive evidence concerning the class communications program and also would hear evidence relative to whether or not the Bank's counsel should be held in contempt of court.

Immediately after the August 24 hearing, Plaintiff's counsel Mr. Froelich happened to see Mr. Langway, who had not attended the hearing. Mr. Froelich advised him what had happened, and asked why the Court's permission had not been sought before undertaking the telephone campaign. The response was that "the Court would have stopped us and we wouldn't have been able to make new law." (Tr. at 265).[18]

## II. SUMMARY FINDINGS OF FACT

Before turning to the conclusions of law, some further findings of fact of a primary nature are appropriately set forth. They are:

(1) The Bank and its counsel have consistently referred to the contacts with prospective class members as a "communications program," and have identified the purposes of the program as (1) providing facts to customers, (2) alleviating customer confusion, and (3) assisting customers in understanding the mechanics of the notice process. In fact, the "communications program," once defrocked and called by the right name, was simply a program to solicit opt-outs dressed in First Amendment trappings. Its purpose was to further what the Bank perceived as its own financial interests. The interests of its customers had nothing to do with it.

The Court recognizes that the telephone campaign may have served one legitimate interest which is shared by the Court: minimizing participation by default.[19] However, other methods are available which do not infringe on the free choice of prospective class members. One is using a bold-type notice on the envelope in which the class notice is mailed, identifying it as a legal notice, such as was done here. Another possibility would be telephonic contacts by a disinterested third party, acceptable to both plaintiff and defendant, who

---

**17.** By the time the communications program had been completed, 4,000 bank customers had been contacted. 3,000 persons (out of a class of 8,000 to 9,000) had elected to exclude themselves.

**18.** Mr. Langway denied making this statement. Taking into account the totality of his demeanor while testifying, his testimony is discredited.

**19.** To some extent, this is an inevitable concomitant of Congress's election to require an opt-out rather than an opt-in procedure in class actions.

would determine whether the notice had been received.

(2) Secondly, counsel for Defendant did not have any good faith belief that Defendant's solicitation campaign would pass muster with this Court, or for that matter, with any court. They had no reason to believe that the Court would sanction, after-the-fact, a program to solicit exclusion requests which was (a) unsupervised, (b) covert, (c) one-sided and/or misleading, and (d) coercive.

The use of a customer's personal loan officer to solicit an exclusion request from him is inherently coercive. This does not mean that *all* customers would be coerced by such a call from their loan officer. However, many would be. These customers would include, for example, those who anticipated seeking a note "roll-over," new loans, extension of lines of credit, or any type of discretionary financial indulgence from their loan officers, and who did not have convenient access to other credit sources. To these customers, Defendant's statement that it would not "call" their loans (*see* No. 10, Customer Question and Answer sheet) if they elected to participate in the case is hardly reassuring. Failure to opt out of a class action is not an event of default under Defendant's note forms. Thus, injecting the idea of retaliation served no purpose other than to coerce. As noted by one of the witnesses, Mr. Kilpatrick:

> A. . . . Those people who have limited access to capital, they develop a strong relationship with one bank. Banks encourage them to do this. This is what we want. We want them to establish a strong relationship with us and rely on us. So, I would say it is vital in many instances to survival of a business for that relationship to remain intact and to be free and friendly and easy.

Tr. at 53–54.

At the point when counsel knew that loan officers were going to make the customer contacts, their advice that contacts would be legal if "noncoercive" became empty rhetoric. Counsel's knowing participation in the solicitation program thereafter made them partners in this aspect of the improper activity as well.

(3) At the same time, the Bank's top management also knew quite well that the use of personal loan officers to solicit exclusion requests was not noncoercive by any means. Mere invocation of the word does not make it so. Although the Bank may have relied on its counsel for general legal advice to the effect that communications with class members could be legal, (the Court is making no finding that it did), there was no good faith reliance on advice by counsel that the particular program undertaken was in fact noncoercive.

(4) Taken in context, some of the materials used as a basis for answering customers' questions were misleading and therefore not totally truthful. Furthermore, both the Bank's top management and its counsel knew that by verbally providing information to customers through Defendant's employees there was a high likelihood that the facts would become even further skewed in transmission. This likelihood was further heightened by the Bank's election to use a non-lawyer, who had little familiarity with the case, but good persuasive skills, to make the primary presentation to those who would be contacting absent class members.

(5) Finally, the reason defense counsel did not seek permission before soliciting exclusion requests was that they knew permission would be denied. There is no good faith basis for asserting the legality of the Bank's solicitation program. At the same time, the Bank perceived that sending a second, corrective notice would be a relatively innocuous remedy under the circumstances. Once loan officers had "put the finger" on their customers, a second notice would probably still yield extra opt-outs. In short, they considered it a "no-lose" situation.

## III.  CONCLUSIONS OF LAW

A.  The Bank's Counsel Violated Rule 4.2 of the ABA Model Rules of Professional Conduct

■  On August 2, 1983, the American Bar Association adopted new Model Rules

of Professional Conduct. Included was the following new rule:

RULE 4.2 Communication with Person Represented by Counsel

In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

The analogous rule prior to that date was contained in Disciplinary Rule 7–104 which provided:

(A) During the course of his representation of a client a lawyer shall not:
(1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.
(2) Give advice to a person who is not represented by a lawyer, other than the advice to secure counsel, if the interests of such person are or have a reasonable possibility of being in conflict with the interests of his client.

■ As has been discussed in the Court's Order of August 30, 1983, discernment of the precise point in time when various aspects of the attorney-client relationship arise in class action proceedings is difficult. Once a class has been certified, some but not all aspects of the relationship are present. A lawyer who represents the named plaintiff in a class which has been certified immediately assumes responsibility to class members for diligent, competent prosecution of the certified claims. However, it cannot truly be said that he fully "represents" prospective class members until it is determined that they are going to participate in the class action.

■■ It is vital in a class action that prospective class members be given objective, neutral information on which to base their decision as to whether to participate or not. The Court is not permitted to consider the probable outcome of the case when a class certification is sought. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *Cruz v. W.B. Hauck,* 627 F.2d 710 (5th Cir.1980); *Miller v. Mackey International, Inc.,* 452 F.2d 424 (5th Cir.1971). Therefore, the judgment may be favorable or unfavorable to class members. The judgment, of course, has legal consequences; *res judicata* is fully applicable in class actions.

■ The Court is primarily responsible for making sure that prospective class members receive objective, accurate information. However, plaintiffs' counsel has a secondary responsibility in this regard. At the time the class notices were sent out in the instant case, the attorney-client relationship existed for the purpose of aiding prospective class members in deciding whether or not to join in the class action.[20] Absent class members were "parties represented by a lawyer," at least for the limited purpose described.

The remaining question is whether or not Mr. Kirby communicated with prospective class members, or, under the preceding disciplinary rule, "caused another to communicate with them."

■ While it is true under either the old disciplinary rule or the new model rule that clients are free to discuss legal matters with each other, that is not an accurate description of what happened here. Although the solicitation program was an idea which initiated with the Bank, not its lawyers, defense counsel became an integral part of it. By actively assisting the Bank in preparing the information to be given to prospective class members, some of which was legal in nature, and organizing the contact system, Mr. Kirby did effectively communicate with persons represent-

---

**20.** This responsibility is discharged by providing neutral, objective information and advice, not by merely relating plaintiffs' contentions. Thus, plaintiffs' counsel in a class action who deceptively lures members into the class to serve the tactical objectives of the named plaintiff could well find himself in grave difficulty after an adverse judgment is rendered.

ed by counsel. He had no legal authorization to do so and no consent from opposing counsel.

These unauthorized contacts are rendered all the more egregious by virtue of their timing and one-sided nature. Many bank customers received the advice and information Mr. Kirby helped prepare before they even saw the class notice. They did not know the nature of the certified claims or class counsel's identity. They had no objective basis for discussing this matter with their loan officers before making tentative commitments to opt out.

In characterizing the extent to which Mr. Kirby's conduct was wilfull, the Court notes that Plaintiffs had repeatedly asserted concerns about the ethics of the Bank's counsel contacting prospective class members. The Court had specifically directed Mr. Kirby in the May 20 and June 30 Orders that informal contacts with prospective class members were not to be undertaken pending further ruling of the Court. Under these circumstances, his election to act unilaterally can only be described as extremely reckless.

B. The Bank's counsel violated Rule 3.4 of the ABA Model Rules of Professional Conduct.

■ The following Rule was in effect on and after August 3, 1983:

Rule 3.4. Fairness to Opposing Party and Counsel. A lawyer shall not:

\*   \*   \*   \*   \*   \*

(c) knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists.

On and after August 3, 1983, Local Rule 221.2 of the United States District Court for the Northern District of Georgia expressly prohibited the solicitation of exclusion requests in class actions. Defendant's conduct, which was undertaken on the advice of its counsel, violated the letter of this local rule. Defense counsel determined unilaterally to disobey this local rule. Plaintiffs' counsel were not notified of this

decision, even though they had expressed repeated concern about contacts with prospective class members, either because contacts might chill participation in the class action or constitute an unethical invasion of the attorney-client relationship.

It is true that the undersigned had previously found Local Rule 221.2 invalid following the Fifth Circuit's *en banc* decision in *Bernard.*[21] However, it remained a rule of this Court; it had not been revoked. Further, the Court finds that the significant point here is not whether Plaintiffs would have succeeded in persuading the undersigned judge that her prior ruling either was in error or that it did not affect the validity of Local Rule 221.23. The important point is that defense counsel's conduct deprived Plaintiffs' of an opportunity to be heard in opposition to Defendant's claim.

Moreover, this is not a case where any arguments Plaintiffs might have made would have been frivolous. Plaintiffs could have made a reasonable argument that Local Rule 221.23, which prohibits solicitation of opt-out requests, is valid without a showing of prior abusive conduct under either the Fifth Circuit's or the Supreme Court's decisions in *Bernard.* Further, if the Court had not accepted that argument, Plaintiffs could have made an alternative request for relief tailored to the specific facts. They could have asked the Court to consider the propriety of the "communications program" in light of its specific nature, substance, and timing.

Finally, even if the Court had accepted Defendant's preposterous "one bite" argument (*i.e.*, even where a party's planned conduct is abusive, he is entitled to commit that abuse at least once before the Court has any power to act), Plaintiffs at least would have been informed and could have planned their own counter-attack.

C. The Bank's counsel violated the Court's instructions when he assisted the Bank in contacting prospective class members

■ On May 20, 1983, the Court directed the Bank's counsel not to contact absent

---

**21.** *See* discussion in footnote 5, *supra.*

class members, except for five persons under certain procedures set forth by the Court, until the Court had had an opportunity to further consider the matter. This conference was attended not only by Mr. Kirby, but also by the Bank's General Counsel and Secretary, Mr. Langway. While it is true the motion arose in the context of discovery, the Order was not limited to discovery matters. The Order was simple: with a limited exception, the Bank's counsel was not to contact prospective class members.

If the Court's Order is viewed as an injunction, it technically applied to the Bank as well as to Mr. Kirby. Mr. Kirby, of course, is not a party in the within litigation. The Bank is the party. The direction given to Mr. Kirby, if it is to be considered an "injunction," was therefore directed to him as agent of the Bank. The discussion preceding the Order centered on Mr. Kirby's further contacts with class members because formal discovery is a lawyer-conducted activity. However, it is not reasonable to therefore conclude that the Order did not cover the Bank. It would be absurd, for example, to suggest that notwithstanding the Court's Order, Mr. Langway could have gone ahead and informally contacted prospective class members.

However, the Court does not believe the May 20 Order is properly classified as an injunction. Rather, it is better interpreted simply as direction to counsel in his capacity as officer of the Court and in pursuance of the Court's inherent power to manage its cases. *See also* Rule 23(d)(2), Fed.R. Civ.P. Findings of fact and technical precision are unnecessary for such direction to be valid; rather the direction must only be (a) within the Court's power and (b) specific enough so that counsel may understand what conduct or action is required. Both of these criteria are amply met in the instant case.

Further, any claim by Mr. Kirby that he thought the Court's prohibition applied only to discovery is meritless. The Court's instructions were explicit: with a limited exception, *Mr. Kirby was not to contact*

*class members.* Moreover, counsel are not permitted to discount the Court's unqualified instructions in light of colloquy which precedes a ruling or in light of the Court's perceived reason for an order. Mr. Kirby is not merely chargeable with notice of this principle; as experienced counsel, he in fact knows it.

In summary, Mr. Kirby intentionally disregarded both the letter and the spirit of the Court's direction when he actively participated in carrying out the Bank's solicitation program.

D. The Bank's counsel violated Rule 8.4 of the ABA Model Rules of Professional Conduct.

▮▮▮ Mr. Kirby violated Model Rule of Professional Conduct 8.4(d) which provides:

*Misconduct*

It is professional misconduct for a lawyer to:

\* \* \* \* \* \*

(d) engage in conduct that is prejudicial to the administration of justice[.]

The specific conduct of counsel which was prejudicial to the administration of justice was counsel's knowing participation in a course of conduct calculated to thwart the objectives of Rule 23, Fed.R.Civ.P., namely, to give prospective class members objective information on which they may make a voluntary decision as to whether or not to participate.

Pursuant to Rule 23(c)(2), Fed.R.Civ.P. the Court prepared and directed to be mailed a formal notice to prospective class members explaining the nature of the litigation, their right to participate or not, and the procedure for exclusion if they did not wish to participate. The notice set forth a specific procedure whereby further information could be obtained: by written inquiries addressed to either Plaintiffs' counsel or defense counsel. By its June 30 Order, the Court required that copies of proposed replies to such inquiries be furnished to opposing counsel before sending

them out,[22] thereby ensuring that replies were acceptable to both counsel, and therefore presumably neutral and objective.

The timing and substance of the Bank's solicitation program made the class notice an afterthought, not the primary source of information concerning the class action. Most customers had not even received the class notice when they gave tentative commitments to opt out. Further, these commitments were obtained by use of one-sided and/or misleading "facts" presented in a coercive setting. Mr. Kirby knew all this. Indeed, he knew he was violating an Order of this Court by participating in the solicitation program. Nonetheless, he proceeded to assist his client in sabotaging the class notice process to gain a tactical advantage.

Thus, the Court's proper role as the manager of the notification process was thwarted. *See* Fed.R.Civ.P. 23(c)(2); *Erhardt v. Prudential Group, Inc.*, 629 F.2d 843, 846 (2d Cir.1980); *Waldo v. Lakeshore Estates, Inc.*, 433 F.Supp. 782, 790 (E.D.La.1977), *appeal dism'd*, 579 F.2d 642 (5th Cir.1978); 2 Newberg on Class Actions §§ 2450, 2475 (1977); *cf. In re Air Crash Disaster at Florida Everglades on December 29, 1972*, 549 F.2d 1006 (5th Cir.1977) (former Fifth Circuit stated that "[i]n class actions we recognize, indeed insist upon, the court's participation as the manager of the case"; 549 F.2d at 1012 n. 8).

## IV.  APPROPRIATE RELIEF

### A.  Remedy

Because the Bank conducted an abusive and improper solicitation campaign, it is necessary for the Court to take remedial action.

The initial consideration in determining the appropriate remedy is the extent of harm done. This cannot be quantified with any precision, of course, without hearing testimony from each and every person contacted—an impossibility. Therefore, the Court must make its own best estimate, taking into account the likely effect of the solicitation program based on its nature. The Court's feeling is that even without the Bank's campaign, the number of exclusion requests probably would have been higher than average. The class is composed primarily of business people, some of whom probably would not wish to be included in a consumer type class action. On the other hand, the opt-out rate here is approximately 30%; that is an extraordinarily high rate. Taking into account the inherent relationship between a loan officer and his customer, and the way in which the campaign was carried out, the Court believes the abusive aspect of the campaign more likely than not had a very substantial impact on the number of opt outs.

The Court's first task in fashioning the appropriate remedy is to attempt to restore the *status quo* if possible. However, the Court agrees with Plaintiffs' counsel that there is no remedy here which will precisely restore the *status quo*. Sending out a second, corrective notice prior to the November 28, 1983 trial date would not offer prospective class members a truly voluntary choice; the improper contact from their loan officers is too recent.

■■■ Another choice would be to omit to send out a second notice at this time, but rather to permit those who opted out based on the abusive solicitation program to void their exclusion requests after judgment, should they wish to do so. While this remedy does not restore the *status quo*, either, the Court considers it preferable to the "corrective notice approach," first because it is fairer to prospective class members. Secondly, the fact that the remedy has some aspects of a penalty is not troublesome here: the Bank's misconduct was of a highly willful nature. Third, it is an ironically equitable remedy because it will fulfill the Bank's stated wish that customers have all "the facts" and that their confusion be minimized. The facts will be

---

**22.** This Order was subsequently modified to permit Plaintiffs' counsel to present inquiries of a confidential nature, with proposed reply, to the Court instead of to defense counsel. *See* Order of August 30, 1983.

clear and there will be no room for confusion once a judgment has been entered for one side or the other.

■ The Court recognizes that the post-judgment opt-in remedy must be considered in light of Defendant's right to due process. After analyzing the ordered remedy and issue, however, the Court concludes that the remedy does not violate any due process right or require due process analysis because the remedy is similar to three judicially recognized situations. First, the post-judgment remedy is somewhat similar to a Title VII across-the-board class action, certified under Rule 23(b)(2), Fed.R.Civ.P., in which class members may file back pay claims after liability has been determined. *Robinson v. Union Carbide Corporation*, 544 F.2d 1258, 1261 (5th Cir.1977) (on rehearing), *cert. denied*, 434 U.S. 822, 98 S.Ct. 65, 54 L.Ed.2d 78 (1977) (Fed.R.Civ.P. 23 permits court to postpone imposing opt-in requirement on class members who seek damages until after liability determined); *cf. Bing v. Roadway Express, Inc.*, 485 F.2d 441, 444 & n. 3 (5th Cir.1973) (after employer's liability determined, court directed employer to notify employees that they must indicate interest in obtaining relief). The class member therefore knows at the time of filing such a claim whether plaintiffs have prevailed in the suit.

The remedy ordered by the Court also presents a situation conceptually similar to that arising from the rule that a contract induced by fraud or made with a minor is voidable. *See* Restatement (Second) of Contracts § 7b (1981); A. Corbin, Contracts § 6 (1963); S. Williston, Law of Contracts § 15 (1957).

Counsel for Plaintiffs provided in his closing argument another example which convinces the Court that no due process problem is raised by the post-judgment remedy ordered in the instant case. That is, the National Labor Relations Board now has remedial authority to issue a bargaining order in absence of a card majority and election victory if the employer has committed such outrageous and pervasive unfair labor practices that there is no reasonable possibility that a free, uncoerced election could be held. *United Dairy Farmers Cooperative Association v. National Labor Relations Board*, 633 F.2d 1054, 1069 (3rd Cir.1980); *e.g. Conair Corporation*, 261 N.L.R.B. No. 178, 1981–82 NLRB Dec. (CCH) ¶ 19,008 (1982); *United Dairy Farmers Cooperative Association*, 257 N.L.R.B. No. 129, 1981–82 NLRB Dec. (CCH) ¶ 18,294 (1981).[23]

## B. Sanctions and Penalties

### 1. Sanctions

■ The district court has a fundamental responsibility to supervise the attorneys who practice before it. *Hull v. Celanese Corporation*, 513 F.2d 568 (2d Cir.1975); *Richardson v. Hamilton International Corporation*, 469 F.2d 1382 (3rd Cir.1972), *cert. denied*, 411 U.S. 986, 93 S.Ct. 2271, 36 L.Ed.2d 964 (1973). This court can *sua sponte* raise ethical problems involving attorney misconduct. *General Mill Supply Company v. SCA Services, Inc.*, 697 F.2d 704 (6th Cir.1982); *Esser v. A.H. Robins Co., Inc.*, 537 F.Supp. 197 (D.Minn.1982); *Universal Athletic Sales Company v. American Gym, Recreational & Athletic Equipment Corporation*, 357 F.Supp. 905 (W.D.Pa.1973). If a court finds that a member of the Bar has committed a breach of professional ethics, it "must carefully scrutinize all relevant circumstances; determine if a breach has *in fact* occurred; and select an appropriate remedy...." *Black v. Missouri*, 492 F.Supp. 848, 860 (W.D.Mo.1980).

■ The Court has seriously considered disqualifying all members and associates of Hansell & Post from further appearing in this case. However, it recognizes that the case is three years old and the proceedings

---

**23.** NLRB's former policy, still followed when the employer's actions do not jeopardize the fairness of a second election, was to set aside the tainted election and hold another one. *E.g.,* Fisher-Haynes Corp. of Georgia, 262 N.L.R.B. No. 155, 1982–83 NLRB Dec. (CCH) ¶ 15,064 (1982).

are complex. Such disqualification would result in a long delay to the detriment of all concerned. Furthermore, such disqualification in a case of this magnitude is a very harsh remedy, both from the law firm's standpoint and from that of the client, which is presumptively entitled to counsel of its choice.

This Court has the inherent authority to impose monetary sanctions against attorneys for misconduct. *See Esser v. A.H. Robins Company*, 537 F.Supp. at 200; *cf. Miranda v. Southern Pacific Transportation Company*, 710 F.2d 516, 520 (9th Cir. 1983); *In re Sutter*, 543 F.2d 1030, 1037–38 (2d Cir.1976). Indeed, *Miranda* emphasized that the authority to impose monetary sanctions does not depend on a prior finding of contempt. 710 F.2d at 521. Thus, although due process may demand procedural safeguards consonant with the severity of the contemplated fine, the power to impose the fine against parties rests with the trial court. The Court concludes that the appropriate fine against Mr. Kirby and Hansell & Post is a fine of $50,000 payable to the Clerk of the Court within ten (10) days of entry of this Order.

## 2. Penalties

28 U.S.C. § 1927 provides:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

The testimony clearly shows that counsel for the Bank knew all along that the unauthorized solicitation program would result in a hearing before the Court to determine its propriety and the issue of remedy. Because they intentionally elected to defer this hearing until after the solicitation program had been carried out, and did not seek the Court's advice in advance, the scope and complexity of the Court's inquiry was greatly broadened. Plaintiffs' counsel were put to a great deal of additional work in gathering evidence and in preparing for the hearing.

■■■ The Bank's counsel elected to proceed this way in order to garner a perceived tactical advantage for their client. As the direct result of this decision, Plaintiffs' counsel were caused considerable trouble and expense, none of which was necessary. This is exactly the type of conduct § 1927 is intended to address. Therefore, the Court hereby ORDERS and DIRECTS that Richard M. Kirby and Hansell & Post reimburse Plaintiffs' counsel for all expenses and attorneys' fees reasonably incurred by Plaintiffs in preparing for and presenting their case at the hearing which occurred on October 5–7, 1983, before the undersigned.

■■■ Section 1927 is not a vehicle whereby the Court may assess sanctions against the Bank. The Court has considered the fact that Mr. Langway, who is a member of the bar, was integrally involved in the conduct found improper; he is also an officer of the Bank. However, the Court concludes that this is not a sufficient basis for imposing the referenced excess costs on the Bank.

Nonetheless, the Court finds it has the inherent power to levy such a sanction against a party. *See Roadway Express, Inc. v. Piper*, 447 U.S. 752, 765, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1960) (court has "inherent power ... to levy sanctions [against both litigants and their counsel] in response to abusive litigation practices"). It is pursuant to this authority that the Court imposes the penalty on the Bank, in addition to counsel, of paying all excess costs. Thus, these excess costs and expenses will be borne, jointly and severally, by defense counsel and Defendant, The First National Bank of Atlanta.

It is generally recognized that Rule 23(d), Fed.R.Civ.P. requires that plaintiffs advance the costs of preparing and mailing the class notice. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *Jones v. Diamond*, 594

F.2d 997 (5th Cir.), *reh'g ordered,* 602 F.2d 1243 (1979), *on reh'g en banc,* 636 F.2d 1364 (5th Cir.1981), *cert. granted,* 452 U.S. 959, 101 S.Ct. 3106, 69 L.Ed.2d 970, *amended,* 453 U.S. 911, 101 S.Ct. 3141, 69 L.Ed.2d 993, *cert. dismissed,* 453 U.S. 950, 102 S.Ct. 27, 69 L.Ed.2d 1033 (1981). These costs are ultimately taxed against the defendant, if plaintiffs prevail on the merits. *E.g., Chevalier v. Baird Savings Association,* 72 F.R.D. 140, 147 n. 12 (E.D.Pa.1976); *Cole v. Schenley Industries, Inc.,* 60 F.R.D. 81, 86–87 (S.D.N.Y.1973). In the Court's opinion, however, the unique facts presently before it are such that it is appropriate that Defendant now reimburse Plaintiffs for the cost of preparing and mailing the notice. The reason is that as the direct result of Defendant's improper conduct, the class notice did not serve the very purpose it was intended to serve: to provide the basic information on which prospective class members could decide whether or not to participate. As noted above, Defendant's conduct caused the class notice to become a mere afterthought in the opt-out process. Accordingly, the Court now ORDERS and DIRECTS that Defendant The First National Bank of Atlanta reimburse Plaintiffs for all costs and expenses incurred in preparing and mailing the class notice.

Plaintiffs have filed a request for reimbursement of costs and attorneys' fees incurred in connection with preparation and mailing of the class notice and preparation for and attendance at the October 5–7 hearing. Defendant has filed a response objecting; it seeks a hearing. The hearing is hereby set for the 22nd day of November, 1983, at 3:00 p.m.

### C. Other Relief

■ As stated above, at a hearing before the undersigned on October 5–7, 1983, the Bank's General Counsel, Mr. Richard Langway, testified. The Court has found that Mr. Langway's testimony was not truthful. The testimony related to a material matter; the untruthfulness did not relate merely to a matter of omission or opinion, but rather to a strictly factual matter.

The Court is unwilling to permit counsel who misrepresent the facts to appear before it. Accordingly, the Clerk is hereby ORDERED and DIRECTED to strike from the docket the appearance of Richard M. Langway, who is designated as one of the counsel of record herein. Mr. Langway shall make no further appearances in this matter.

■ Finally, Richard M. Kirby is hereby DISQUALIFIED from further participation in this case. Although the Court expects counsel appearing before it to vigorously advocate their client's causes, observance of the Court's orders and proper standards of conduct are also required. Taking all factors into account, including the degree of wilfulness involved here, disqualification is an appropriate remedy. Therefore, the Clerk is hereby ORDERED and DIRECTED to strike from the docket the appearance of Richard M. Kirby. Mr. Kirby shall make no further appearances herein.

### SUMMARY

In summary, the Court ORDERS and DIRECTS that all exclusion requests received by the Clerk in the within consolidated class actions shall be voidable, at the election of the individuals who excluded themselves, after judgment. If the judgment or any portion thereof is favorable to Plaintiffs, the Court will enter a further Order detailing the manner in which such election may be exercised and the conditions (if any) on which it may be exercised. Further, the Court hereby ORDERS and DIRECTS Richard M. Kirby and Hansell & Post to pay a fine in the sum of $50,000.00 to the Clerk of this Court no later than ten (10) days of date of entry of this Order. The Court hereby AWARDS Plaintiffs all fees and expenses reasonably incurred by them in connection with the preparation and mailing of the class notice, and preparation and attendance at the October 5–7, 1983 hearing, and DIRECTS that these ex-

penses be borne jointly and severally by Richard M. Kirby, Hansell & Post, and The First National Bank of Atlanta. Finally, Richard M. Langway and Richard M. Kirby and hereby STRICKEN as counsel of record in the above captioned cases.

## APPENDIX

| TROY NATION, et al. | : | |
| | : | CIVIL ACTION |
| | : | |
| vs. | : | NO. C80–1468A |
| | : | |
| | : | |
| WINN–DIXIE STORES, INC.; | : | |
| WINN–DIXIE ATLANTA, INC. | : | |

### ORDER

This Title VII case is presently before the Court on Defendants' request of the Court for a ruling on whether the named Plaintiffs' scheduled meeting with potential absent class members violates Local Rule 221.2 prohibiting certain communications from counsel in actual or potential class actions.

The meeting is scheduled to be held this evening; a copy of the notice sent out to potential class members is appended to Plaintiffs' letter brief dated May 11, 1981. The notice is headed "LET'S END DISCRIMINATION AT WINN–DIXIE" and in essence invites potential class members to share their race-related grievances against Winn-Dixie with the named Plaintiffs and their lawyers. It also is an invitation to potential class members to come and inform themselves about the pending lawsuit.

Plaintiffs' Motion for Class Certification is presently pending before the Court and has not been ruled on. Plaintiffs seek 23(b)(2) and (b)(3) certification of a class comprised of all black employees working at Winn-Dixie stores in the Metro Atlanta area. The notice in question was mailed to potential class members. The estimates of Plaintiffs' counsel as to the number of persons who received the notice and who were therefore invited to the meeting range from 175 to 475.

At a hearing conducted today, Plaintiffs' counsel indicated that the primary purpose for the meeting was discovery, including learning the names of witnesses who may be able to testify in support of Plaintiffs' allegations, whether or not the case is certified as a class action. No order has been entered in this case limiting the initial discovery to matters pertaining to class certification; merits discovery has been ongoing for some time.

Plaintiffs' counsel admit having sent out the notices mentioned above. No prior permission was sought from the Court. This matter was brought to the Court's attention by Defendants' counsel's letter of May 8, 1981. Plaintiffs' position is basically that Local Rule 221.2 is unconstitutional per the Fifth Circuit's ruling in *Bernard v. Gulf Oil Co.*, 619 F.2d 459 (5th Cir.1980).

Basically, the *Bernard* case holds that a broad court order forbidding communication between class action counsel and their clients on the one hand and potential or actual class members on the other hand, without prior court approval, is an unconstitutional prior restraint, unless the court finds that such communication in a given instance will result in "direct, immediate and irreparable damage." *Id.* at 473; 476. The particular order declared unconstitutional in *Bernard* was drawn from that suggested in the Manual for Complex Litigation, Part II, Section 1.41 (1973 ed.). So is this District's Local Rule 221.2.

The conclusion that the Fifth Circuit's ruling in *Bernard* invalidates this Court's Local Rule is inescapable, and the Court therefore declares such Local Rule to be invalid and unenforceable.

Although Defendants have not specifically requested the Court to enter any order setting parameters or limitations on Plaintiffs' conducting of the planned meeting, the Court on its own motion elects to do so. The Court's interest in so doing is to insure that any information received by the potential class members concerning the pending action is factual. This is because in the near future, the invitees to the meeting may be presented with the opportunity to opt out of this litigation. Hence, the Court finds it inappropriate and damaging to the fair administration of justice in this lawsuit for such persons to attend a one-sided presentation of the objectives and possible benefits of the pending lawsuit. Therefore, the Court does by this Order require as a condition of Plaintiffs' holding the scheduled meeting for the evening of Tuesday, May 12, that representatives of Defendants, including their lawyers, be permitted to attend and make a presentation to those present, along with Plaintiffs' presentation. Further, the Court directs that Plaintiffs' counsel indicate at such meeting to those present that (1) the pending action has not been certified as a class action at this time and (2) the claims of the parties are conflicting and that the Court has not in any way ruled on the merits of the action.

The Court notes Plaintiffs' desire to conduct discovery from possible witnesses, and recognizes that among potential class members there may be such witnesses. However, such discovery from potential class members is hereby STAYED at this time pending the Court's ruling on the Motion for Class Certification, provided, however, that Plaintiffs may if they wish obtain a list of names, addresses and telephone numbers from those attending the May 12 meeting who believe they may have information relevant to Plaintiffs' claims.

SO ORDERED, this 12 day of May, 1981.

/s/ Orinda D. Evans
ORINDA D. EVANS
UNITED STATES
DISTRICT JUDGE

## NOTICE TO CERTAIN BORROWERS OF THE FIRST NATIONAL BANK OF ATLANTA

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, you are informed as follows:

### 1. The Lawsuit

On May 28, 1980 and August 19, 1981 certain borrowers of The First National Bank of Atlanta (herein called the "Bank"), on behalf of themselves and other borrowers similarly situated, filed civil suits in this Court against the Bank. The cases have been consolidated for trial.

### 2. Named Plaintiffs In The Suit

Jackie Kleiner and George W. Morosani are the named plaintiffs in the lawsuits. They seek relief for themselves and others similarly situated.

### 3. Defendant In The Suit

The defendant is The First National Bank of Atlanta, a national bank organized and existing under the laws of the United States.

### 4. Plaintiffs' Claims

The plaintiffs claim that the Bank breached their loan agreements by charging them more interest than they contracted to pay. The interest on plaintiffs' loans was tied to the "prime rate" of the Bank. The plaintiffs claim that the Bank overcharged them in the following two ways:

(i) by charging interest tied to the Bank's announced prime rate rather than some lower rate plaintiffs claim the Bank charges either its "best Commercial borrowers with respect to ninety (90) day borrowings" or its "best and most creditworthy commercial customers," and

(ii) by charging interest on the basis of a 360-day year rather than a 365-day year (this claim is not limited to just those persons who have loans tied to the Bank's "prime rate").

Plaintiffs further claim that the Bank is liable to each plaintiff and other borrowers

similarly situated in an amount equal to the alleged interest overcharge.

### 5. The Defendant's Denial

The Bank has responded to the plaintiffs' claims, denying any wrongdoing, denying liability, and asserting affirmative defenses. This notice is not to be construed as an admission of any kind whatsoever by the Bank.

### 6. The Court's Class Action Order

On April 15, 1983, the Court entered an Order pursuant to Rule 23 of the Federal Rules of Civil Procedure determining that this action may be maintained as a class action. The class has been defined as follows:

(1) All persons who borrowed money from Defendant First National Bank of Atlanta and who signed promissory notes between May 28, 1978 and May 31, 1981 stating that interest would be paid at the rate of:

＿＿＿ percent per annum in excess of the rate charged by [the] bank from time to time to its best commercial borrowers with respect to ninety (90) day borrowings (the "Prime Rate").

(2) All persons who borrowed money from Defendant First National Bank of Atlanta and who signed real estate notes from August 18, 1978 to the present stating that:

interest shall accrue at the rate of ＿＿＿ percent per annum plus the "prime rate" currently charged from time to time by [the bank] to its best and most creditworthy commercial customers... If at any time or from time to time such prime rate increases or decreases, then the rate of interest hereunder shall be correspondingly increased or decreased effective on the day on which any such increase or decrease of such prime rate is publicly announced. In the event that [the bank], during the term hereof, shall abolish or abandon the practice of publishing the prime interest rate, or should the same become unascertaina-

ble. Holder shall designate a comparable reference rate which shall be deemed to be the "prime rate" hereunder.

(3) All persons who borrowed money from Defendant First National Bank of Atlanta and who signed notes from May 28, 1978 to the present stating that interest was to be calculated on a "per annum" basis or a 360-day year simple interest basis.

The Order is conditional and pursuant to said rules, may be altered, amended, or vacated before decision on the merits.

### 7. Effect Of Court Order On Certain Borrowers Of The Bank

All persons described in the foregoing definition who do not request to be excluded from this action in the manner set forth in Paragraph 8 below will be deemed to be members of the class, will be represented in this action by the named plaintiffs, and will be bound by the judgment of the Court in this action, whether favorable or unfavorable to the class plaintiffs.

### 8. Requesting Exclusion From This Lawsuit

If you do not wish to be included as a member of the class defined in Paragraph 6 above, you must complete the "Exclusion Request" form enclosed with this Notice, sign that form, and mail it to the Clerk of this Court at the address shown on the "Exclusion Request" on or before September 27, 1983. If your "Exclusion Request" is timely mailed, you will be excluded from the class and will not share in the recovery, if any, and you will not be precluded from prosecuting your claim by a separate action against the Bank, whether the judgment in this case is favorable or unfavorable to the class of plaintiffs herein defined.

### 9. Right To Counsel

Pursuant to Rule 23(c)(2)(C) of the Federal Rules of Civil Procedure, if you do not request exclusion from the class, you may enter your appearance in this suit by counsel of your choice. If you do not enter

such an appearance, your interest will be represented by the attorneys for the named plaintiffs, being the following four law firms: Berger, Kapetan, Malakoff & Meyers, P.C., of Pittsburgh, Pennsylvania; Brown, Michael & Froelich, of Atlanta; Martin, McDuffie & Coleman, of Atlanta; and Remar, Arnold & Zimring, of Atlanta. You may also intervene as a party in this action and you have the right to state to the Court at any time whether you consider the representation of the class by said attorneys to be fair and adequate.

**10. Questions To Be Directed To Either Plaintiffs' Counsel Or Defendant's Counsel**

Please address all inquiries you may wish to make about this action to either or both of the below listed parties:

(1) Plaintiffs' counsel—Jerome J. Froelich, Jr., Suite 1500, 2 Peachtree Street, Atlanta, Georgia 30383.

(2) Bank's counsel—Richard M. Kirby, Hansell & Post, 3300 First Atlanta Tower, Atlanta, Georgia 30383.

All such inquiries and communications must be in writing and must be postmarked no later than August 27, 1983.

**11. Court Papers Available For Inspection**

The pleadings and other papers filed in this lawsuit are available for inspection at the office of the Clerk of the Court at the above address under the designation **Jackie Kleiner v. The First National Bank of Atlanta**, No. C80–921A, and **George W. Morosani v. The First National Bank of Atlanta**, No. C81–1553A.

**12. Court Not Expressing An Opinion**

This Notice is not to be construed as an expression of any opinion by the Court with respect to the merits of the respective claims or defenses asserted in this lawsuit. This Notice and the attached "Exclusion Request" are sent merely to advise you of the pendency of the lawsuit and your rights with respect to it.

Dated this 5th day of August, 1983
By Order of the Court,
/s/ Ben H. Carter
Clerk, United States District Court, Northern District of Georgia, Atlanta Division

**EXCLUSION REQUEST**

Mr. Ben H. Carter, Clerk
United States District Court
Northern District of Georgia
2211 U.S. Courthouse
75 Spring Street, S.W.
Atlanta, Georgia 30335

Re: Kleiner v. The First National Bank of Atlanta, No. C80–921A

and

Morosani v. The First National Bank of Atlanta, No. C81–1553A

I have received the "Notice to Certain Borrowers of The First National Bank of Atlanta" dated August 5, 1983, concerning the above-captioned case, stating the rights which I have with respect thereto. Please exclude me from the above class action.

_____
(Signature)
PLEASE PRINT:
Name: _____
Address: _____
_____
Date: _____
**THIS FORM IS TO BE SIGNED AND MAILED ONLY IF YOU DESIRE TO BE EXCLUDED FROM THE ABOVE CLASS ACTION.**

780

Office of the Clerk
United States District Court
2211 U.S. Courthouse
75 Spring Street, S.W.
Atlanta, Georgia 30335

FIRST CLASS
U.S. POSTAGE
PAID
Permit No. 704
Atlanta, GA

**This is an important Legal Notice concerning litigation by certain borrowers against the First National Bank of Atlanta.**

*First Atlanta Corporation*
*Post Office Box 414*
*Atlanta, Georgia*

*Thomas R. Williams*
*Chairman of the Board*

August 10, 1983

Dear Employee:

More than three years ago a lawsuit was filed against First Atlanta by Jackie Kleiner, an attorney and business law professor then residing in Atlanta. As we informed our employees at the time, Mr. Kleiner, having received substantial loans from First Atlanta, accused our bank of charging more interest than he had agreed to pay. On August 18, 1981, another suit of the same type was filed by George W. Morosani. Our bank absolutely denies any wrongdoing or liability in these cases. We, of course, believe First Atlanta will be found innocent of these charges.

Recent developments will result in your hearing more about this matter and I want to bring you up to date on what has happened and to explain the next apparent step in this case.

1. Last April 15, the U.S. District Court consolidated and certified the two lawsuits as a "class action," which had the effect of bringing in an estimated 9,000 other First Atlanta customers "similarly situated"—unless they exercise their right not to be included in the case.

2. Notices will be sent to these thousands of First Atlanta customers by the Clerk of the U.S. District Court, probably within the next few days, informing them of the "class action" ruling and providing them the opportunity to be excluded from the lawsuit against the bank. In order to not be a party to the lawsuit, they must sign and return an "Exclusion Request" to the Court.

On the basis of experience in other cases, we are convinced that many of the First Atlanta customers who receive these notices will be confused and alarmed by the appearance of the notices and references to various legal actions and terms in the document. We are very concerned that our customers will think they are being sued by someone or will not understand how they were included in the case or otherwise be confused and upset. We feel strongly that we should act to clarify this matter as much as possible.

Accordingly, you should know these facts:

1. Mr. Kleiner's original loan of $100,000 from First Atlanta in 1978 was made with his signing the bank's standard printed promissory note form—in language typical of that used throughout the banking industry for many years. Interest on the note was tied to the bank's "prime rate."

2. In his lawsuit Mr. Kleiner contends the bank breached his loan agreement by overcharging interest in two ways—basing interest on the "announced" prime rather than the "lowest" rate charged commercial borrowers, and by computing interest on a "360-day year" rather than a "calendar year."

3. First Atlanta denies any such breach of contract because Mr. Kleiner and the bank *agreed* that his interest was to be tied to the announced prime rate and interest would be computed on the basis of a 360-day year, consistent with longstanding banking custom and practice throughout the United States.

4. The agreement was made at the time without any protest or complaint about the rate by Mr. Kleiner, who was then a practicing attorney in Atlanta and a university professor who taught business law. Mr. Kleiner holds the following degrees: Master of Business Administration, New York University; Bachelor of Law, New York Law School; Master of Law, New York Law School; Doctor of Juridical Science, New York Law School; Bachelor of Business Administration, University of Georgia; Diploma in Foreign Law, Columbia University's Parker School for Foreign and Comparative Law.

5. The issue has not come to trial and no decision has been made on the merits of the case. In the notice mailed to our customers, the Court states that this "is not to be construed as an expression of any opinion by the Court with respect to the merits" of the case.

This lawsuit calls in question the honesty of our banking practices and those of other institutions; it also could cast reflection on our fine employees. We intend to do everything legally within our power to protect and defend the reputation of First Atlanta and our employees for fairness and integrity in business. We are proud of our institution and of you, our 4,000 employees. We appreciate your loyalty and support.

If you have any further questions, please contact your supervisor. Thank you again for your many contributions to First Atlanta's growth and progress. We remain confident of the soundness of our factual and legal position.

Sincerely,

/s/ Thomas R. Williams

#### CUSTOMER QUESTIONS AND ANSWERS

1. Q: How did the court get my name? What happened to the confidentiality of my relationship with you?

A: The court obtained your name through bank records. Confidentiality of information about our customers is protected by court order.

2. Q: Which law firm represents Kleiner?

A: Kleiner is represented by the following three law firms: Brown, Michael & Froelich, of Atlanta; Martin, McDuffie & Coleman, of Atlanta; and Remar, Arnold & Zimring, of Atlanta.

3. Q: Which law firm represents First Atlanta?

A: Hansell & Post.

4. Q: Who is Kleiner? How much did he borrow? What are his charges against the bank?

A: Mr. Kleiner is a practicing attorney in Atlanta and a university professor who taught business law. He holds the following degrees: Master of Business Administration, New York University; Bachelor of Law, New York Law School; Master of Law, New York Law School; Doctor of Juridical Science, New York Law School; Bachelor of Business Administration, University of Georgia; Diploma in Foreign Law, Columbia University's Parker School for Foreign and Comparative Law. He resided in Atlanta at the time the lawsuits were filed. He borrowed approximately $215,000. His charges against the bank are fraud and breach of contract.

5. Q: Who is Morosani? How much did he borrow? What are his charges against the bank?

A: Morosani is a real estate developer and owns and operates a warehouse in North Carolina. He borrowed $1.6 million to construct an addition to his warehouse in North Carolina. His charges are the same as Kleiner's.

6. Q: Can I get a copy of the promissory note I signed with you that put me in the class action?

A: If the bank has a copy, it can be provided to you.

7. Q: How much do Kleiner and his attorneys know about me?

A: The court required that the Bank provide the following information: your name and address; how much money you borrowed and when; and the interest rate you paid.

8. Q: If a customer chooses not to exclude himself, would Kleiner then have access to information related to his account?

A: Yes, if it was relevant to the lawsuit.

9. Q: What is in this for me if I stay in the class? What is the total amount of the lawsuit? If the class loses, do I have to pay legal fees?

A: If you stay in the class and the plaintiff wins, you might or might not recover some money. We don't know how much, if any. Absent class members don't pay legal fees.

10. Q: Can you call my loan if I participate in the suit?

A: We have no intention of retaliation by such means.

11. Q: If you lose the suit, will you survive? Are my assets (deposits) safe? Can the bank absorb a loss? Will the suit and the result thereof impact your ability to service my account?

A: Yes, we will survive. Yes, your deposits are safe. Yes, the bank can absorb the loss. No, the suit will not impact our ability to service your account.

12. Q: Are you insured against possible loss? Does the loss ultimately come from bank funds?

A: No; Yes.

13. Q: How many other people received exclusion forms?

A: Everybody in the class received exclusion forms—approximately eight to nine thousand customers.

15. Q: What should I do? What do you want me to do?

A: Do whatever you think is right. It is the bank's position that it didn't breach its contract with anyone. If you don't think the bank breached its loan agreement with you, then we don't believe that you should sue us.

If you don't want to sue us, you must exclude yourself from the class by signing and mailing the "Exclusion Request" to the Clerk of the Court no later than September 27, 1983.

16. Q: How does a "class" action suit work? Do I have to come to court? Do I have to hire an attorney?

A: In a class action the named plaintiff represents a number of unnamed plaintiffs who are "similarly situated." You will be included in the case and will be suing the bank unless you choose to exclude yourself. We do not know if you will have to come to court. You do not have to have an attorney, but you may.

17. Q: Define the classes of the suit. Which class am I in?

A: One is prime rate borrowers, the other is 360-day year borrowers. You could be in one or both classes.

18. Q: What is 365/360 day calculation? Why do you calculate on 360? Show me the difference.

A: Using the 360-day year method, you divide the per annum interest rate by 360, resulting in a daily rate applied for the number of days the loan is outstanding. Using the 365-day year method, you divide by 365. Interest calculated on the basis of a 360-day year is 1/72 greater than the interest calculated on the basis of a 365-day year.

19. Q: What is your definition of Prime? If you're not guilty, why did you change your Prime Rate definition?

A: The prime rate is the rate we announce as our prime rate. We changed some of the wording in our note form to limit the size of the class.

20. Q: I received more than one form; do I have to sign all of them?

A: No, you don't have to sign all the forms.

21. Q: How is my share of the suit figured?

A: We do not know.

22. Q: Do other banks follow the same practices in setting interest rates?

A: Yes, other banks follow the same practices. We understand Mr. Kleiner is actively promoting similar lawsuits against many other institutions.

23. Q: How long do I have to respond?

A: You have until September 27, 1983, to send the Exclusion Request to the Court.

24. Q: Why didn't you try to settle out of court?

A: We have been approached by the plaintiff to settle the case. We were unable to reach an agreement. No settlement discussions are presently taking place.

25. Q: I have a fiduciary responsibility to my company's shareholders to stay in the suit.

A: You don't have a fiduciary responsibility to stay in this suit, particularly if you don't believe that the bank misled you and breached your loan agreement. We believe that you should not participate in this case unless you believe you were wronged by the bank.